# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date:  August 3, 2017**

**NO. S-1-SC-35524**

**STATE OF NEW MEXICO, ex rel.**
**LEAGUE OF WOMEN VOTERS OF NEW MEXICO,**

Petitioner,

v.

**ADVISORY COMMITTEE TO THE**
**NEW MEXICO COMPILATION COMMISSION,**

Respondent.


**ORIGINAL PROCEEDING**


InAccord, P.C.
Daniel A. Ivey-Soto
Albuquerque, NM

for Petitioner


Hector H. Balderas, Attorney General
Ari Biernoff, Assistant Attorney General
Regina A. Ryanczak, Assistant Attorney General
Santa Fe, NM

for Respondent

New Mexico Association of Counties
Grace Philips
Santa Fe, NM

For Amicus Curiae New Mexico Association of Counties

Disability Rights New Mexico
Tim Gardner
Alice Liu Cook
Albuquerque, NM

for Amicus Curiae Disability Rights New Mexico

James E. Harrington, Jr.
Santa Fe, NM

The Duhigg Law Firm
Katy M. Duhigg
Albuquerque, NM

for Amicus Curiae Common Cause New Mexico

Egolf, Ferlic & Harwood, LLC
Katherine M. Ferlic
Jamison Barkley
Santa Fe, NM

for Amicus Curiae Drug Policy Alliance New Mexico

**OPINION**

**MAES, Justice.**

{1}    Article VII, Sections 1 and 3 of the New Mexico Constitution set forth the elective franchise, which is among the most precious rights in a democracy. The two provisions work in tandem to establish and guarantee the right to vote. Section 1, among other things, identifies who is qualified to vote; and Section 3 protects the right from being "restricted, abridged or impaired on account of religion, race, language or color, or inability to speak, read or write the English or Spanish languages . . . ." N.M. Const. art. VII, §§ 1, 3.

{2}    To protect the elective franchise even further, the framers declared in two separate constitutional provisions that Article VII, Sections 1 and 3 "shall never be amended except upon a vote of the people of this state in an election at which at least three-fourths of the electors voting in the whole state . . . shall vote for such amendment." N.M. Const. art. VII, § 3; *see* N.M. Const. art. XIX, § 1. These heightened protections have led this Court to describe Article VII, Section 1, as the "unamendable section" of the Constitution. *See State ex rel. Witt v. State Canvassing Bd.*, 1968-NMSC-017, ¶ 8, 78 N.M. 682, 437 P.2d 143.

{3}    Petitioner, League of Women Voters of New Mexico, sought a writ of

2

mandamus directing Respondent, Advisory Committee to the New Mexico Compilation Commission, to effectuate the compilation of three constitutional amendments to the so-called unamendable section. The proposed amendments to Article VII, Section 1 were submitted to the electorate in 2008, 2010, and 2014, and each received more than a majority, but less than a three-fourths super-majority, of the vote. The Compilation Commission did not compile the amendments into the Constitution.

{4}     Petitioner asked this Court to clarify that under a separate constitutional provision, the 2008, 2010, and 2014 amendments required the approval of only a simple majority of the voters. *See* N.M. Const. art. XIX, § 1 (1996) (setting forth general requirements for amending the Constitution and specific requirements for amendments that "restrict the rights created" in Article VII, Section 1, among others). As such, Petitioner contended that Respondent has a non-discretionary duty to advise the Compilation Commission to compile the amendments into the Constitution. Respondent took no position on the merits of the question presented, but asked that we deny the petition on the grounds that Respondent was not a proper party. After full briefing by the parties and by numerous amici curiae and after hearing oral arguments, we granted the petition and issued a writ of mandamus as requested by

3

Petitioner. We now issue this formal opinion to explain our reasoning.

## I.      Facts and Procedural History

{5}      In 2008, Constitutional Amendment 4 was placed on the ballot for the general election. The amendment proposed to amend Article VII, Section 1 to permit school elections to be held with other, non-partisan elections:

> Every citizen of the United States, who is over the age of twenty-one years, and has resided in New Mexico twelve months, in the county ninety days, and in the precinct in which [he] the person offers to vote thirty days, next preceding the election, except idiots, insane persons and persons convicted of a felonious or infamous crime unless restored to political rights, shall be qualified to vote at all elections for public officers. The legislature may enact laws providing for absentee voting by qualified electors. All school elections shall be held at different times from [other] partisan elections.

2008 N.M. Laws, S.J. Res. 4, § 1 at 1554 (showing original language of Article VII, Section 1 in brackets and strikethrough; showing proposed language with underlining). The proposed amendment received 512,962 votes in favor of passage or 74.48 percent of the votes cast on the amendment. *See* N.M. Sec'y of State, *Canvass of Returns of General Election Held on November 4, 2008 - State of New Mexico*, at 11, http://www.sos.state.nm.us/uploads/files/Election%20Results/StatewideGen08.pdf (last visited July 20, 2017). The amendment was not compiled into the Constitution.

{6}     In 2010, Constitutional Amendment 3 was placed on the ballot for consideration by the voters.  The 2010 amendment proposed to substantially revise the first sentence of Article VII, Section 1 to account for various changes in federal voting law and to remove the provision's offensive use of the terms "idiots" and "insane persons":

> [Every citizen of the United States, who is over the age of twenty-one years, and has resided in New Mexico twelve months, in the county ninety days, and in the precinct in which he offers to vote thirty days, next preceding the election, except idiots, insane persons and persons convicted of a felonious or infamous crime unless restored to political rights, shall be qualified to vote at all elections for public officers.] Every person who is a qualified elector pursuant to the constitution and laws of the United States and a citizen thereof shall be qualified to vote in all elections in New Mexico, subject to residency and registration requirements provided by law, except as restricted by statute either by reason of criminal conviction for a felony or by reason of mental incapacity, being limited only to those persons who are unable to mark their ballot and who are concurrently also unable to communicate their voting preference.  The legislature may enact laws providing for absentee voting by qualified electors.  All school elections shall be held at different times from other elections.

2010 N.M. Laws, S.J. Res. 6, § 1 at 1229 (showing original language of Article VII, Section 1 in brackets and strikethrough; showing proposed language with underlining).  The proposed amendment received 290,593 votes in favor of passage or 56.92 percent of the votes cast on the amendment.  *See* N.M. Sec'y of State, *Canvass of Returns of General Election Held on November 2, 2010*, at 8, http://www.

5

sos.state.nm.us/uploads/files/StatewideResults_Gen_2010.pdf (last visited July 20, 2017). Again, the amendment was not compiled into the Constitution.

{7} In 2014, Constitutional Amendment 1 was placed on the ballot for consideration. Like the 2008 amendment, Constitutional Amendment 1 sought to amend Article VII, Section 1 to allow for school elections to take place in conjunction with non-partisan elections. 2013 N.M. Laws, H.R.J. Res. 2, § 1 at 2569. The language of the proposed amendment was substantively identical to the amendment proposed in 2008. *Compare id. with* 2008 N.M. Laws, S.J. Res. 4, § 1 at 1554. The amendment received 258,673 votes in favor of passage or 57.68 percent of the votes cast on the amendment. *See* N.M. Sec'y of State, *Canvass of Returns of General Election Held on November 4, 2014 - State of New Mexico*, at 9, http://www.sos.state. nm.us/uploads/files/Statewide%20Summary.pdf (last visited July 20, 2017). Like the amendments proposed in 2008 and 2010, the 2014 amendment was not compiled into the Constitution.

{8} On September 24, 2015, more than ten months after the election on the 2014 amendment, Petitioner filed a Petition for a Writ of Mandamus. Petitioner asked this Court to direct Respondent to advise the Compilation Commission to compile the 2008, 2010, and 2014 amendments into Article VII, Section 1 of the New Mexico

6

Constitution. We ordered Respondent to file a response and subsequently denied the petition without further briefing or argument. *See State ex rel. League of Women Voters v. Advisory Comm. to the N.M. Compilation Comm'n, writ granted*, No. 35,524, Sept. 29, 2015). Petitioner then filed a motion for rehearing, which we granted and ordered full briefing and oral argument on four issues, three that are procedural and one that poses questions of substantive law: whether the petition is timely or time-barred, whether Petitioners have standing to raise the issues presented in the petition, whether the Advisory Committee is the proper respondent to the petition, and the interpretation of any conflicts or inconsistencies in the constitutional provisions at issue. *See State ex rel. League of Women Voters v. Advisory Comm. to the N.M. Compilation Comm'n, writ granted*, No. 35,524 (Mar. 7, 2016). We assert original jurisdiction under Article VI, Section 3 of the New Mexico Constitution over extraordinary writs for mandamus against state officers, boards, and commissions. *See State ex rel. Bird v. Apodaca*, 1977-NMSC-110, ¶ 3, 91 N.M. 279, 573 P.2d 213.

**II.     Discussion**

**A.     Petitioner Has Standing to Petition for Mandamus**

{9}     We first address whether Petitioner has standing to raise the issues presented in this proceeding. We need not address here whether Petitioner meets the traditional

requirements for standing of an organization because this Court has inherent authority to confer standing when the issue brought by a party presents a matter of great public importance. *See ACLU of N.M. v. City of Albuquerque*, 2008-NMSC-045, ¶ 33, 144 N.M. 471, 188 P.3d 1222 ("It is clear that this Court can 'confer' standing and reach the merits of a case regardless of whether a plaintiff meets the traditional standing requirements, based on a conclusion that the questions raised involve matters of great public importance.").

{10} "Assuming mandamus would otherwise lie, we exercise our power of original jurisdiction in mandamus if the case presents a purely legal issue that is a fundamental constitutional question of great public importance." *Cty. of Bernalillo, N.M. v. N.M. Pub. Reg. Comm'n*, 2000-NMSC-035, ¶ 6, 129 N.M. 787, 14 P.3d 525. The substantive question raised by the petition here—whether the 2008, 2010, and 2014 amendments were properly approved by the voters and therefore should be compiled into the Constitution—is a matter of great public importance. The right of qualified electors to vote is fundamental to the integrity of state government. So too is the question of whether a constitutional provision has been validly amended, particularly when the provision in question directly implicates the right to vote. *See, e.g., Cobb v. N.M. State Canvassing Bd.*, 2006-NMSC-034, ¶ 39, 140 N.M. 77, 140

P.3d 498 ("[T]he issue of clarifying our Election Code, especially in the current political climate, make this a case of great public importance."). We therefore conclude that Petitioner has standing in this proceeding, regardless of whether the traditional elements of standing have been satisfied. *Cf. Gunaji v. Macias*, 2001-NMSC-028, ¶ 20, 130 N.M. 734, 31 P.3d 1008 (conferring third-party standing in an election case implicating the guarantee of free and open elections under Article II, Section 8 of the New Mexico Constitution).

**B.      The Substantive Question in This Proceeding Is Not an Election Contest and Therefore Is Not Time-barred by the Election Code**

{11}     We next consider whether the petition presents an untimely election contest under the Election Code's thirty-day statute of limitations. *See* NMSA 1978, § 1-14-3 (1971). Respondent emphasizes that the petition was filed approximately one, five, and seven years after the elections at issue were certified—well beyond the thirty days permitted to file an election contest under Section 1-14-3. Petitioner counters that Section 1-14-3 is inapposite because the substantive issue presented, whether a simple majority of the voters was enough to approve the 2008, 2010, and 2014 amendments, is not an election contest. We must resolve the question because if the petition amounts to an untimely election contest under Section 1-14-3, we need not reach the merits of the constitutional issue presented. *See Morris v. Brandenburg*,

9

2016-NMSC-027, ¶ 14, 376 P.3d 836 (noting that if a statutory determination will resolve the case, "we need not address [p]etitioners' constitutional claims"); *Allen v. LeMaster*, 2012-NMSC-001, ¶ 28, 267 P.3d 806 ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so.").

{12}     Section 1-14-3 provides, "Any action to contest an election shall be commenced by filing a verified complaint of contest in the district court . . . . Such complaint shall be filed no later than thirty days from issuance of the certificate of . . . election to the successful candidate." The thirty-day limit "accords with the need for speedy resolution of election contests[.]" *Gunaji*, 2001-NMSC-028, ¶ 26. The thirty-day limit does not apply, however, to just any challenge to governmental action associated with or following an election that might render "virtually every lawsuit against a governmental entity . . . subject to the Election Code's thirty-day statute of limitations." *Glaser v. LeBus*, 2012-NMSC-012, ¶ 11, 276 P.3d 959.

{13}     Instead, in *Dinwiddie v. Bd. of Cty. Comm'rs*, 1985-NMSC-099, ¶ 7, 103 N.M. 442, 708 P.2d 1043, we identified certain features of these challenges crucial for characterizing the challenges as election contests invoking the Section 1-14-3 thirty-day limit. The plaintiffs in *Dinwiddie* sought a declaratory judgment to: (1) invalidate

a special bond election due to allegedly faulty election procedures and (2) disallow certain "[i]nvalid" ballots. *Dinwiddie*, 1985-NMSC-099, ¶ 1. The district court dismissed the complaint because, among other things, it was not verified as required by Section 1-14-3. *Dinwiddie*, 1985-NMSC-099, ¶¶ 1-2. The plaintiffs argued on appeal that their claim to invalidate the election was distinct from their claim to invalidate certain ballots and therefore was not an election contest subject to the requirements of Section 1-14-3. *Dinwiddie*, 1985-NMSC-099, ¶ 7. This Court disagreed and held both issues raised in the district court were election contests under Section 1-14-3, explaining:

> A challenge to the validity of an election is also a challenge to its result, for if it is successful, the result is changed. Similarly, a challenge to the result contests the inherent validity of the election. *Both seek to alter the certified result of the election.* An election is a process, not a single event, and the whole process or any part of it, may be subject to contest.

*Dinwiddie*, 1985-NMSC-099, ¶ 7 (emphasis added); *see also Glaser*, 2012-NMCA-028, ¶ 20 ("We thus view New Mexico case law as defining an election contest as a challenge to the result of an election, as well as a challenge to the inherent validity of an election when the challenge would necessarily require overturning the results or effects of the election.").

{14}    By contrast, the contentions Petitioner presses in this case—namely, that the

11

2008, 2010, and 2014 amendments were validly approved by the voters—do not "seek to alter the certified result of the election[s]" or contest "the whole process or any part of [the elections]." *Dinwiddie*, 1985-NMSC-099, ¶ 7. There is no question in this case that each of the elections conformed with the requirements of the Election Code and no question that the 2008, 2010, and 2014 amendments received 74.48 percent, 56.92 percent, and 57.68 percent of the votes, respectively. *See* NMSA 1978, §§ 1-1-1 to 1-24-4 (1969, as amended through 2016). The sole question is whether the three amendments—having received more than a simple majority, but less than a three-fourths super-majority, of the votes cast—were duly ratified and therefore should have been compiled into the Constitution. Rather than seeking to alter the certified results of the elections, the petition seeks clarity about the meaning and effect of the uncontested certified results of the elections under our Constitution. Accordingly, the petition does not present an election contest and therefore is not untimely under Section 1-14-3.

**C.    The Advisory Committee Is a Proper Respondent**

{15}    We next turn to whether the Advisory Committee is a proper respondent in this proceeding. Petitioner candidly admits it is unsure who the proper respondent should be because "[n]either the constitution nor the statutes assign the duty of declaring the

12

winner of a constitutional amendment." Petitioner contends, however, that "the Advisory Committee has been performing that function [declaring the winner of an election for a constitutional amendment], even if it has been doing so unwittingly." Petitioner therefore asserts that the Advisory Committee is the proper respondent for a writ of mandamus.

{16} The Advisory Committee disagrees. It argues that it has no responsibility to declare the results of an election and it therefore has not failed to fulfill any legal duty to Petitioner. According to the Advisory Committee, the State Canvassing Board is the proper respondent for the relief being sought by Petitioner, as the Canvassing Board is the entity charged under the Constitution and the Election Code with the duty to "canvass and declare the result of the election." N.M. Const. art. V, § 2; NMSA 1978, § 1-13-15 ("The Canvassing Board 'shall also canvass and declare the result of the vote on any constitutional amendment . . . .' "

{17} The Advisory Committee is appointed by this Court and tasked with providing "advice and approval" to the Compilation Commission. *See* NMSA 1978, § 12-1-3 (2006) (providing that the Compilation Commission "act[s] on the advice and approval of an advisory committee appointed by the New Mexico supreme court"). Without the Advisory Committee's advice and approval, the Compilation

13

Commission cannot fulfill its statutory responsibilities, which include compiling, certifying, and publishing the various laws of the state of New Mexico. *See id.*; NMSA 1978, § 12-1-7 (2006) (providing that the Commission shall, "with the advice and approval of the advisory committee[,]" certify the 1978 compilation); *see also* § 12-1-3.1 (setting forth additional powers of the Commission). In other words, the Advisory Committee's advice and approval is a condition precedent to the valid exercise of the Compilation Commission's authority. *Cf.* NMSA 1978, § 12-1-7 (2006) ("Upon the certification of the compilation of 1978 or any supplement by the New Mexico compilation commission, with the advice and approval of the advisory committee of the supreme court, the compilation or supplement shall be in force . . . .").

{18} Thus, the Advisory Committee must provide advice and approval for any action necessary for the Compilation Commission's execution of its statutory responsibilities. The duty necessarily extends to advising and approving the compilation of duly ratified constitutional amendments. The duty would extend to advising and approving the compilation of the 2008, 2010, and 2014 amendments, if they were properly approved by the electorate. But the Committee has not so advised the Commission here, and the amendments have therefore not been compiled. Thus,

14

if we agree in this proceeding that the amendments were properly approved, it would be incumbent upon the Advisory Committee to advise and approve their compilation by the Commission. We therefore hold that the Advisory Committee is the proper Respondent, and we need not consider whether the State Canvassing Board also may be a proper respondent. We turn to the merits of the petition.

**D.  The 1996 Amendment to Article XIX, Section 1 Preserved Historic Protections for the Political and Educational Rights of Minorities While Making Article VII, Section 1 and Its Sister Provisions Easier to Amend in General**

{19}  The substantive question before us is whether the 2008, 2010, and 2014 amendments to Article VII, Section 1 were effective, having received more than a simple majority, but less than a three-fourths super-majority, of the vote. To answer this question, we must interpret two constitutional provisions that address how Article VII, Section 1 may be amended. "Interpretation of constitutional clauses begins with the language of the text." *State v. Lynch*, 2003-NMSC-020, ¶ 15, 134 N.M. 139, 74 P.3d 73. We seek to construe constitutional provisions in harmony, but when "provisions cannot be harmonized, the specific section governs over the general regardless of priority of enactment." *City of Albuquerque v. N.M. State Corp. Comm'n*, 1979-NMSC-095, ¶ 6, 93 N.M. 719, 605 P.2d 227. If "one section is not readily identifiable as the more specific one of the two[,] . . . the latter provision

15

governs 'as the latest expression of the sovereign will of the people, and as an implied modification pro tanto of the original provision of the Constitution in conflict therewith.' " *Id.* ¶ 6 (quoting *Asplund v. Alarid*, 1923-NMSC-079, ¶ 11, 29 N.M. 129, 219 P. 786).

**1.    Article XIX, Section 1, as Amended in 1996, Controls the Outcome of This Proceeding**

{20}    The requirements for amending Article VII, Section 1 are prescribed in two constitutional provisions—Article XIX, Section 1 and Article VII, Section 3. Article XIX, Section 1 sets forth the requirements for amending the Constitution and provides, in general, that an amendment becomes part of the Constitution once it has been approved by a simple majority of both houses of the Legislature and ratified by a simple majority of the voters in a popular election. Article VII, Section 3 protects the rights of New Mexicans "to vote, hold office or sit upon juries" and declares that those rights "shall never be restricted, abridged or impaired on account of religion, race, language or color, or inability to speak, read or write the English or Spanish languages."

{21}    Both provisions also impose heightened requirements for amending several constitutional provisions, including Article VII, Section 1, that guarantee certain political and educational rights. Article XIX, Section 1, amended in 1996, provides

16

in relevant part:

> [n]o amendment shall restrict the rights created by Sections One and Three of Article VII hereof, on elective franchise, and Sections Eight and Ten of Article XII hereof, on education, unless it be proposed by vote of three-fourths of the members elected to each house and be ratified by a vote of the people of this state in an election at which at least three-fourths of the electors voting on the amendment vote in favor of that amendment.

Article VII, Section 3 similarly provides:

> the provisions of this section [Section Three] and of Section One of this article [Article VII] shall never be amended except upon a vote of the people of this state in an election at which at least three-fourths of the electors voting in the whole state, and at least two-thirds of those voting in each county of the state, shall vote for such amendment.

Thus, rather than the simple majorities required to amend other constitutional provisions, Article XIX, Section 1 and Article VII, Section 3 both require an amendment to Article VII, Section 1 to pass with at least three-fourths of the votes cast on the amendment in a statewide election. *See* N.M. Const. art. XIX, § 1; N.M. Const. art. VII, § 3; *see also Witt*, 1968-NMSC-017, ¶ 38 (holding that the requirement in Article VII, Section 3 for " 'at least three-fourths of the electors voting in the whole state' " was met when the amendment received the vote of at least three-fourths of the electors who voted on the amendment). For ease of reference, we refer to this threshold as the three-fourths requirement for the remainder of this opinion.

17

{22} Despite sharing the three-fourths requirement, these provisions differ in several ways with respect to how Article VII, Section 1 may be amended. One of these differences, according to Petitioner, is outcome-determinative in this proceeding. Specifically, Petitioner asserts that Article XIX, Section 1 imposes the three-fourths requirement only on an amendment that "*restrict*[s] *the rights created by* Sections One and Three of Article VII hereof, on elective franchise . . . ." (emphasis added). Article VII, Section 3, by contrast, imposes the three-fourths requirement on an amendment to "*the provisions of* this section [Section Three] and of Section One of this article [Article VII] . . . ." (emphasis added). The difference, according to Petitioner, is that under the former provision, an amendment that is neutral or that expands the rights set forth in Article VII, Section 1 takes effect like an amendment to any other constitutional provision, when it receives a simple majority of the votes in the Legislature and in an election.

{23} We agree that these two provisions conflict about when the three-fourths requirement applies to an amendment to Article VII, Section 1. Further, the general-specific rule is of little help because the two provisions address distinct aspects of Article VII, Section 1: Article XIX, Section 1 protects the *rights* created in the provision, whereas Article VII, Section 3 protects the *language* used to create

18

those rights. *Cf. State v. Santillanes*, 2001-NMSC-018, ¶ 7, 130 N.M. 464, 27 P.3d 456 ("[I]f two statutes *dealing with the same subject* conflict, the more specific statute will prevail over the more general statute absent a clear expression of legislative intent to the contrary. The specific statute operates as an exception to the general statute . . . ." (emphasis added) (citation omitted)). The question before us, therefore, is answered by the simple rule that "the latter provision governs as the latest expression of the sovereign will of the people, and as an implied modification pro tanto of the original provision of the Constitution in conflict therewith." *City of Albuquerque*, 1979-NMSC-095, ¶ 6 (internal quotation marks and citation omitted).

{24}    As we explain more fully below, the conflicting language between Article XIX, Section 1 and Article VII, Section 3 resulted from amendments to the former provision that were approved by the voters in 1996. *See* 1996 N.M. Laws, H.R.J. Res. 2, § 1 at 1074-76 (proposing various amendments to Article XIX). Prior to the 1996 amendments, both provisions imposed the three-fourths requirement on any amendment "to the provisions of" Article VII, Section 1. *See* N.M. Const. art. XIX, § 1 (1911); N.M. Const. art. VII, § 3. The amended language of Article XIX, Section 1 therefore is controlling as the most recent expression of the sovereign will of the people. *See City of Albuquerque*, 1979-NMSC-095, ¶ 6. To fully understand

the meaning and effect of the 1996 amendments, we review the history of the three-fourths requirement as it has evolved to its present formulation in Article XIX, Section 1.

**2.      Article VII, Section 1 Is One of Four Provisions Intended to Protect Political and Educational Rights of Minorities**

{25}      The three-fourths requirement featured in the original Constitution was submitted to Congress after the constitutional convention of 1910. *See The Constitution of the State of New Mexico*, H.R. Doc. No. 1369, at 25-26, 38-39, 1911 Leg., 3d. Sess. (1911). The requirement protected four constitutional provisions from easy amendment: "sections one and three of article seven hereof on elective franchise and sections eight and ten of article twelve hereof on education . . . ." H.R. Doc. No. 1369, at 39 (Article XIX, Section 1, requiring an amendment to Article VII, Sections 1 and 3 and Article XII, Sections 8 and 10 to pass with three-fourths of the votes of both houses); H.R. Doc. No. 1369, at 25-26 (Article VII, Section 3, requiring an amendment to Article VII, Sections 1 and 3 to receive at least three-fourths of the popular vote in a statewide election); H.R. Doc. No. 1369, at 35-36 (Article XII, Section 10, requiring an amendment to Article XII, Section 10 to receive at least three-fourths of the popular vote in a statewide election).

{26}      Three of the four provisions protected by the three-fourths requirement

explicitly guarantee certain political and educational rights for Spanish-speakers. *See* N.M. Const. art. VII, § 3 ("The right of any citizen of the state to vote, hold office or sit upon juries, shall never be restricted, abridged or impaired on account of religion, race, language or color, or inability to speak, read or write the English or Spanish languages except as may be otherwise provided in this constitution . . . ."); N.M. Const. art. XII, § 8 ("The legislature shall provide for the training of teachers in the normal schools or otherwise so that they may become proficient in both the English and Spanish languages, to qualify them to teach Spanish-speaking pupils and students in the public schools and educational institutions of the state, and shall provide proper means and methods to facilitate the teaching of the English language and other branches of learning to such pupils and students."); N.M. Const. art. XII, § 10 ("Children of Spanish descent in the state of New Mexico shall never be denied the right and privilege of admission and attendance in the public schools or other public educational institutions of the state, and they shall never be classed in separate schools, but shall forever enjoy perfect equality with other children in all public schools and educational institutions of the state, and the legislature shall provide penalties for the violation of this section.").

{27}     The fourth provision protected by the three-fourths requirement—Article VII,

Section 1, which is the subject of this proceeding—sets forth voter eligibility and addresses other voting-related matters. While the provision does not explicitly mention Spanish-speakers, it has always guaranteed the right to vote without reference to a person's ability to speak, read, or write in English. *See* N.M. Const. art. VII, § 1 (1911) (providing in part that "[e]very male citizen . . . shall be qualified to vote at all elections for public officers"); *Witt*, 1968-NMSC-017, ¶ 39 (holding that Article VII, Section 1 was successfully amended, thereby extending the right to vote by absentee ballot and repealing the language restricting the voting rights of women and "Indians not taxed").

{28} Scholars and historians agree that these four provisions were intended to safeguard the political and educational rights of Spanish-speaking citizens in the aspiring state. *See, e.g.*, 2 Ralph Emerson Twitchell, *The Leading Facts of New Mexico History*, at 587 (facsimile of original 1912 ed., Sunstone Press 2007) (observing in the new Constitution that "the Spanish-speaking citizen was so thoroughly protected in his rights"); Robert W. Larson, *New Mexico's Quest for Statehood* 1846-1912, at 279, (The University of N.M. Press 1968) ("Constitutional safeguards of the rights of *Hispanos* were made nearly impossible to amend."); David V. Holtby, *Forty-Seventh Star*, at 243-44 (University of Okla. Press 2012) ("The

constitution also ensured the civil rights of Nuevomexicanos in politics and education, which made it unique among such documents and an early promoter of equality . . . . [T]he constitution afforded strong protections for Nuevomexicanos in the use of their language, including in public affairs, in voting, and in schools."). As one scholar has explained, "The stringent provisions regarding equality for the Spanish-speaking citizen were intended to overcome the fears and apprehensions of the native population that they might be discriminated against by the Anglo majority." Larson, *supra*, at 279.

{29} The history surrounding New Mexico's attempts to become a state—and the language repeatedly employed to block statehood—reveal the source of the framers' concern for the political and educational rights of Spanish-speakers. To be sure, a number of factors delayed New Mexico's admission to the Union as a state until 1912, including the growing controversy over slavery. *See id.* at 50-57 (describing events leading to the Compromise of 1850 in which California was admitted as a free state and New Mexico and Utah were organized as territories without reference to slavery). But from the time New Mexico was annexed to the United States in 1848 from Mexico, its "Spanish-speaking, Roman Catholic people" were the subject of prejudice and ridicule. *See id.* at 12, 303.

23

{30}    In 1848 for example, Senator Daniel Webster of Massachusetts argued on the Senate floor that the people of New Mexico were unfit to govern themselves as a state. *See* Holtby, *supra*, at 4. He implored, "Have they [New Mexicans] any notion of popular government? Not the slightest. . . . It is farcical to talk of such people making a constitution for themselves." *Id.* (internal quotation marks omitted) (omission in original) (quoting 10 Daniel Webster, *The Writings and Speeches of Daniel Webster*, at 21, 29-30, 27-28 (1903)). As support for his views, Senator Webster quoted from the writings of an Englishman who recently had visited New Mexico and had found its people lacking: "[Nuevomexicanos] are as deficient in energy of character and physical courage as they are in all the moral and intellectual qualities. In their social state but one degree removed from the veriest savages." Holtby, *supra*, at 4 (alteration in original). Fifty years later, aspiring Senator Albert J. Beveridge echoed these sentiments in his imperialistic "March of the Flag" speech at the Republican National Convention, describing New Mexico as having a "savage and alien population." *Id.* at 42. Mr. Beveridge won his election and later, as chair of the Senate Committee on Territories from 1901-1911, blocked several of New Mexico's last attempts at statehood. *Id.* at 95.

{31}    In the first decade of the twentieth century, similar attitudes were on display,

24

particularly about voting rights for the territory's non-Anglo population. In 1906, for example, after the Republican candidate won in a closely contested election to become New Mexico's congressional delegate, one prominent territorial newspaper accused non-Anglo New Mexicans of being under gang control and argued that they should not be permitted to vote. Holtby, *supra*, at 118-119. The paper declared that "it emphatically would remove the privilege of voting from anyone . . . whose moral nature is so low, whose intellectual capacity is so limited that it cannot exercise this privilege with intelligence, virtue, and honesty, but instead falls under the whip of the [political] party and of a partisan lackey." *Id.* (alteration in original). The paper elaborated, "[T]here is but one race on the earth qualified by its nature to manage and govern man's destiny—the pure Anglo-Saxon." *Id.* Far away in the Senate, there was similar talk of adding a literacy requirement to the Enabling Act to deny the vote to Spanish-speaking New Mexicans, most of whom were presumed to be illiterate. *See id.* at 239; *see also id.* at 54 (summarizing the views of a then-leading educational expert who claimed that the illiteracy rate in the New Mexico territory circa 1900 was "scandalously high" and approaching 60 percent).

{32} Despite decades of hostility toward New Mexico's Spanish-speaking population, Congress passed the Enabling Act for New Mexico in 1910, free from

25

literacy tests and other measures that would have restricted the political rights of Spanish-speaking New Mexicans. *See* Enabling Act for New Mexico, ch. 310, 36 Stat. 557 (1910). New Mexico held a constitutional convention that same fall in Santa Fe, and nearly a third of the convention's one hundred elected delegates were native Spanish-speakers. *See* Larson, *supra*, at 274. Their influence on the final document was clear, as evidenced by the four provisions protected by the three-fourths requirement and the inclusion of the three-fourths requirement itself. *See* N.M. Const. art VII, § 3; N.M. Const. art. XIX, § 1; *see also, e.g.*, N.M. Const. art. II, § 5 ("The rights, privileges and immunities, civil, political and religious guaranteed to the people of New Mexico by the Treaty of Guadalupe Hidalgo shall be preserved inviolate.").

{33} Congress's response to the proposed Constitution has been well-documented, and we need not revisit it here in detail. *See, e.g.*, *Witt*, 1968-NMSC-017, ¶¶ 1-6 (comparing the text of Article XIX, Section 1, as originally proposed to Congress and as amended after a statewide popular vote required by Congress before New Mexico would be admitted as a state). Suffice it to say, Congress generally approved of the proposed Constitution but conditioned New Mexico's admission on holding an election for a proposed amendment to Article XIX, Section 1 to make the general

26

provisions of the Constitution easier to amend. *See* S.J. Res. 57, 62nd Cong. § 3, 37 Stat. 39 (1911) (enacted). Congress prescribed the language of the proposed amendment and required the ballots to be printed separately "on paper of a blue tint, so that they may be readily distinguished from the white ballots provided for the election of county and State officers." *See id.* §§ 3, 4.

{34} But Congress's "blue ballot" proposal did not affect the three-fourths requirement for amending Article VII, Section 1 and its sister provisions. *See id.* Indeed, the proposal arguably fortified the protections in Article XIX, Section 1 for the four protected provisions. *Compare The Constitution of the State of New Mexico*, H.R. Doc. No. 1369, at 39 (requiring an amendment to the four protected provisions to pass with the support of three-fourths of the vote of both houses) *with* S.J. Res. 8, 62nd Cong. (1911) (enacted) (requiring such an amendment to pass with three-fourths of the vote of both houses *and* three-fourths of the vote in a statewide popular election). Thus, while Congress sought to make the Constitution easier to amend in general, it respected New Mexicans' desire to protect the political and educational rights of Spanish-speakers in the aspiring state. *See Chase v. Lujan*, 1944-NMSC-027, ¶¶ 74-78, 48 N.M. 261, 149 P.2d 1003 (Mabry, J., dissenting) (explaining that Congress conditioned New Mexico's admission on a popular vote to amend Article

XIX, Section 1 due to concern "that we should have a more easily amended Constitution, as to all general amendments, but not to include those relating to the elective franchise, equal educational opportunities and equal right to hold office"). New Mexicans approved the amendment to Article XIX, Section 1 in November 1911, and New Mexico was admitted to the Union in January 1912 after more than six decades as a territory. *See* Proclamation No. 62, 37 Stat. 1723 (Jan. 6, 1912); *see also* Chuck Smith, *The New Mexico State Constitution, A Reference Guide* 1, 12 (Greenwood Press 1996).

**3.     The Heightened Protections for Article VII, Section 1 Proved to Be an Effective Deterrent to Amending That Section**

{35}     Since New Mexico became a state, the heightened protections for Article VII, Section 1 have frustrated numerous attempts to expand voting rights, despite expansions at the federal level. *See, e.g.*, U.S. Const. amend. XIX (extending the franchise to women); U.S. Const. amend. XXVI (extending the franchise to citizens over the age of 18). As early as 1920, New Mexicans made their first of many attempts to amend the Constitution to permit absentee voting. *See generally Baca v. Ortiz*, 1936-NMSC-054, 40 N.M. 435, 61 P.2d 320 (considering whether a 1920 amendment to Article VII that permitted absentee voting for members of the military was validly enacted); *see also Witt*, 1968-NMSC-017, ¶ 8 (observing that prior to

28

1967 "no less than ten unsuccessful attempts were made . . . to amend the constitution so as to make absentee voting possible"). The 1920 amendment was thought to have passed, but sixteen years later, this Court held that it was void "because [the amendment was] never constitutionally adopted." *See Baca*, 1936-NMSC-054, ¶¶ 10, 13 (noting that the amendment had passed with 6,742 votes in favor and 5,069 against, or 57.08 percent of the vote, and thus had failed to satisfy the three-fourths requirement).

{36}     Similar attempts to amend Article VII, Section 1 failed, not only because of the three-fourths requirement, but also because of the requirement that an amendment to that provision must receive two-thirds of the votes cast in each county. *See* N.M. Const. art. VII, § 3; N.M. Const. art. XIX, § 1 (1911). This additional requirement was the subject of this Court's opinion in *Witt*. In that case, more than 81 percent of the voters in a statewide election had voted in favor of an amendment to Article VII, Section 1 to permit absentee voting and to repeal the provision's original language that restricted the right to vote for women and for "Indians not taxed." *See Witt*, 1968-NMSC-017, ¶¶ 2, 9, 14. Nonetheless, the amendment would have failed because despite having met the three-fourths requirement, it had not received the requisite two-thirds majority of the votes cast in every county. *See id.* ¶ 9 n.11 ("[A]

change of 634 votes in twelve counties was needed to meet the requirement of Art. VII, Sec. 3, and Art. XIX, Sec. 1."). *Witt* held the two-thirds requirement to be an unconstitutional violation of the Equal Protection Clause of the Fourteenth Amendment. *Witt*, 1968-NMSC-017, ¶ 20 ("Where, as here, a vote in Harding County outweighs a hundred votes in Bernalillo County, the 'one person, one vote' concept announced in Gray v. Sanders, [372 U.S. 368 (1963)], certainly is not met."). The amendment therefore was effective, having satisfied the three-fourths requirement by passing with more than 81 percent of the vote. *See Witt*, 1968-NMSC-017, ¶ 39.

{37} *Witt* thus left the three-fourths requirement as the sole protection against amending Article VII, Section 1 and its sister provisions. Even by itself, however, the three-fourths requirement has proven difficult to overcome. Despite numerous attempts to amend Article VII, Section 1, no proposed amendment has met the 75 percent threshold since *Witt*, including the amendments in this proceeding, which received 74.48 percent, 56.92 percent, and 57.68 percent of the votes cast in their respective elections. *See also, e.g.*, 1973 N.M. Laws, H.R.J. Res. 31, § 1 at 2040 (proposing to amend Article VII, Section 1 by, *inter alia*, lowering the voting age to 18); N.M. Const. art. VII, § 1 compiler's notes (noting that the proposed 1973

30

amendment "was defeated by a vote of 25,198 for and 16,455 against").

**4. The 1996 Amendments to Article XIX, Section 1 Clarified That the Three-fourths Requirement Applies Only to Amendments That Restrict the Right to Vote**

{38} Against this historical backdrop, the Legislature created a Constitutional Revision Commission in 1993 and tasked it with reviewing the Constitution of New Mexico and other states and to recommend changes "as it deems desirable and necessary." *See* NMSA 1978, §§ 12-15-1 to -7 (1993, expired prior to the convening of the second session of the forty-second Legislature in 1996). After completing its review, the commission recommended revisions to ten of the Constitution's twenty-four articles. *See Report of the Constitutional Revision Commission* Table of Contents (Dec. 1995) [hereinafter Report]. The recommendations were separated by importance, ranging from "Highest Priority" to "Lower Priority." *See id.* at i-iv. Significantly, all of the "Highest Priority" recommendations were directed at the "Amendment Process" set forth in Article XIX, which the commission described as "the major defect in the current constitution." Report, *supra*, at i-ii, 98.

{39} The commission recommended a number of "Highest Priority" amendments to Section 1 of Article XIX, in particular, to allow for greater flexibility in amending the Constitution. Report, *supra*, at 101 (recommending the creation of "an additional

31

mechanism which allows substantial constitutional revision without the necessity of calling a constitutional convention"). For purposes of this proceeding, the most notable recommendation was to amend the requirements for amending Article VII, Section 1 and its sister provisions protected by the three-fourths requirement. Report, *supra*, at 102. The commission acknowledged the importance of the heightened requirements, which "stem from the historic sensitivity to minority rights which were clearly articulated in the 1910 constitution." *Id.* at 102. The commission nonetheless recommended replacing the phrase "no amendment shall *apply to or affect the provisions of* Sections One and Three of Article VII hereof, on elective franchise" with "[n]o amendment shall *restrict the rights created by* Sections One and Three of Article VII hereof, on elective franchise." Report, *supra*, 100. This change, according to the commission, "would maintain the historic rights-protection purpose of the original provision, while also allowing expansion of such rights without the restrictions of the supermajority requirement." *Id.* at 102; *see also id.* at ii (recommending an amendment to Article XIX, Section 1 "[t]o eliminate the 75 % requirement to bring about general change in voter qualifications, while preserving that important requirement for the protection of minority rights"). The commission also recommended eliminating the requirement for two-thirds of the vote in each

county, which had been held unconstitutional in *Witt.* Report, *supra*, at 102. And the commission recommended parallel amendments to Article VII, Section 3 so that the two provisions would remain consistent with each other with respect to the three-fourths requirement. Report, *supra*, at 56-57; *see also id.* at 89-90 (recommending similar revisions to Article XII, Section 10).

{40} Based on the commission's report, the Legislature submitted several proposed amendments to the voters in 1996, including Constitutional Amendment 4, a proposal to amend Article XIX for the first time since the blue ballot amendment of 1911. *See* 1996 N.M. Laws, H.R.J. Res. 2, § 1 at 1074-77 (proposing various amendments to Article XIX); *see also Piecemeal Amendment of the Constitution of New Mexico 1911 to 2010*, at 16, N.M. Leg. Council Serv. (18th. Rev. Apr. 2011). The amendment to Article XIX, Section 1 passed with nearly 64 percent of the vote which changed the language to: "[n]o amendment *shall restrict the rights created by* Sections One and Three of Article VII hereof, on elective franchise . . . ." as described above. *See* 1996 N.M. Laws, H.R.J. Res. 2, § 1 at 76 (emphasis added); *see also* N.M. Sec'y of State, *Canvass of Returns of General Election Held on November 5, 1996 - State of New Mexico*, at 13, http://www.sos.state.nm.us/uploads/files/1996%20General%20 Summary.pdf (last visited July 2017). As previously explained, the three-fourths

requirement in Article XIX, Section 1 now safeguards "the rights created by" Article VII, Section 1, rather than "the provisions of" that section. The Legislature, however, did not submit to the voters the commission's recommended parallel amendments to Article VII, Section 3. The 1996 amendments to Article XIX, Section 1 thus created the disparity at issue in this proceeding.

{41} In light of the foregoing history, we hold that the 1996 amendment to Article XIX, Section 1 effectuated a deliberate, long-overdue refinement of the three-fourths requirement. The requirement continues to protect against amendments that would restrict the voting rights of any non-English speaking minority who is otherwise qualified to vote. *Accord* N.M. Const. art. VII, § 3 (providing that the right to vote "shall never be *restricted, abridged or impaired* on account of religion, race, language or color, or inability to speak, read or write the English or Spanish languages" (emphasis added)); *Cf. State v. Rico*, 2002-NMSC-022, ¶ 11, 132 N.M. 570, 52 P.3d 942 ("Although the state constitution speaks of an inability 'to speak, read or write the English or Spanish languages,' we construe the provision to require reasonable accommodation for a language barrier posed by competency only in a language other than English."). But the requirement can no longer frustrate the will of a majority of the voters to expand the right to vote or to make other changes to

34

general voter qualifications that do not restrict the elective franchise. Under the controlling language of Article XIX, Section 1, such an amendment requires only a simple majority of the vote to become part of the Constitution. Having clarified the intended meaning of the 1996 amendment, we consider whether the 2008, 2010, and 2014 amendments were effective.

**E.     The 2008, 2010, and 2014 Amendments Did Not Restrict the Rights Created in Article VII, Section 1 and Therefore Became Effective With a Simple Majority of the Popular Vote**

**1.     The 2008 and 2014 Amendments Were Effective**

{42}     The 2008 and 2014 amendments to Article VII, Section 1 were straightforward and identical. *See* 2008 N.M. Laws, S.J. Res. 4, § 1 at 1554; 2013 N.M. Laws H.R.J. Res. 2, § 1 at 2569. Both replaced the pronoun "he" with "the person," consistent with the modern convention of replacing gender-specific language with gender-neutral language whenever possible. *See* NMSA 1978, § 2-3-13.1(C) (2013) ("Whenever current laws and other published legislative documents are the subject of a legislative request to the legislative council service for amendment or revision, the legislative council service as part of its work shall replace gender-specific language with gender-neutral language where appropriate and reasonable."). This change is neutral with respect to the rights created in Article VII, Section 1 and

35

therefore was validly approved by a simple majority of the voters. *Accord Witt*, 1968-NMSC-017, ¶ 14 (setting forth amendments to Article VII, Section 1, including the repeal of language that restricted the right to vote for women).

{43} More substantively, the 2008 and 2014 amendments also provided, "All school elections shall be held at different times from ~~other~~ <u>partisan</u> elections." 2008 N.M. Laws, S.J. Res. 4, § 1 at 1554; 2013 N.M. Laws, H.RJ. Res. 2, § 1 at 2569. Petitioner contends that this change allows "school elections [to] be combined with non-partisan elections, but [to] remain separate from partisan [elections]." As such, Petitioner argues that this change is neutral with respect to voting rights because it is a "scheduling matter and not a change to the elective franchise." Amicus curiae Common Cause New Mexico agrees that the change implicates the timing of school elections. Common Cause further argues that permitting school elections to be consolidated with other non-partisan elections will improve voter turnout and participation and thereby expand access to the elective franchise.[1] *See* Zoltan L. Hajnal et al., *Municipal Elections in California: Turnout, Timing, and Competition*

---

[1]Common Cause New Mexico is a self-described "non-partisan, grassroots organization dedicated to fair elections and making government at all levels more democratic, open, and responsive to the interests of all people." They persuasively demonstrate that voter turnout over the past decade in Albuquerque, Las Cruces, and Santa Fe has been far lower at school elections than at non-partisan municipal elections.

36

vii-viii (2002), http://ppic.org/content/pubs/report/R_302ZHR.pdf (last visited July 20, 2017) (concluding, based on a study of municipal elections in California, that the timing of elections affected voter turnout more than any other factor and that "a move to concurrent elections has the greatest potential to expand voter participation in California's local political arena"). *Id.* ix. We take no position on whether improving participation by already-registered voters represents an expansion of the right to vote. Nevertheless, we are satisfied that allowing school elections to take place with other non-partisan elections, at a minimum, is neutral with respect to the rights created in Article VII, Section 1. As the 2008 and 2014 amendments did not restrict voting rights, only a simple majority was required for ratification.

**2.      The 2010 Amendment Was Effective**

{44}     A close comparison of the existing language of Article VII, Section 1 with the proposed language of the 2010 amendment similarly reveals that the amendment would either expand or be neutral with respect to voter qualifications. Since Article VII, Section 1 was amended in *Witt*, the first sentence has read as follows:

> Every citizen of the United States who is over the age of twenty-one years and has resided in New Mexico twelve months, in the county ninety days, and in the precinct in which he offers to vote thirty days, next preceding the election, except idiots, insane persons and persons convicted of a felonious or infamous crime unless restored to political rights, shall be qualified to vote at all elections for public officers.

37

N.M. Const. art. VII, § 1(A).

{45} These qualifications and exclusions are rooted in the original Constitution submitted to Congress after the constitutional convention of 1910. *See The Constitution of the State of New Mexico*, H.R. Doc. No. 1369, at 25. As such, they do not reflect significant developments in federal voting law over the past century. *See, e.g.*, U.S. Const. amend. XXVI, § 1 (1971) ("The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."); 52 U.S.C. § 10502 (1970) (providing that no United States citizen shall be denied the right to vote for President or Vice President "because of the failure of such citizen to comply with any durational residency requirement"); 52 U.S.C. § 20507(a)(3)(B) (2002) (providing that a registered voter's name may not be removed from a state's voter rolls except, *inter alia*, "as provided by state law, by reason of criminal conviction or mental incapacity"). Moreover, the terms used to exclude otherwise-qualified voters are outdated and do not provide clear constitutional standards. Terms like "infamous crime[s]" and "idiots [and] insane persons" are of little help in determining who should be permitted to vote. *See Carroll v. Cobb*, 354 A.2d 355, 359 (N.J. Super. Ct. App. Div. 1976) ("[I]t should be abundantly evident that a lay person is completely

38

unequipped to determine whether an applicant is either an 'idiot' or an 'insane person,' . . . and thus disenfranchised. Indeed, we suspect that those imprecise terms may be troublesome to experts in the fields of psychiatry or psychology."). Worse still, the latter are deeply offensive by modern standards to describe individuals who suffer from a mental illness or disability.

{46} The 2010 amendment therefore proposed to "modernize" the first sentence of Article VII, Section 1 by rewriting it as follows:

> Every person who is a qualified elector pursuant to the constitution and laws of the United States and a citizen thereof shall be qualified to vote in all elections in New Mexico, subject to residency and registration requirements provided by law, except as restricted by statute either by reason of criminal conviction for a felony or by reason of mental incapacity, being limited to only those persons who are unable to mark their ballot and who are concurrently also unable to communicate their voting preference.

*See* 2010 N.M. Laws, S.J. Res. 6 at 1229 ("Proposing an Amendment to Article 7, Section 1 of the Constitution of New Mexico to Modernize Language on Qualified Electors by Removing Language Denigrating Persons With Developmental Disabilities, Adopting Federal Requirements to Vote, Defining Mental Incapacity for Voting Purposes and Restricting Felons From Voting Except as Restored by Statute."). If effective, the amendment would extend the right to vote to those who (1) are qualified electors under the Constitution and laws of the United States, (2) are

39

citizens of the United States, and (3) meet residency and registration requirements as provided by law. The amendment would exclude an otherwise-qualified voter who is restricted by statute from voting because the voter (1) is a convicted felon or (2) lacks mental capacity, limited to an inability to mark one's ballot and to communicate one's voting preference.

{47} By modernizing the language in Article VII, Section 1, the 2010 amendment would simplify a confusing web of federal and state laws regarding voter qualifications. In doing so, the amendment would expand, or at least would not restrict, the right to vote in several ways. First, the amendment would align the right to vote under the New Mexico Constitution with federal voting laws. The practical effect of such an alignment would be minimal because federal law already supersedes Article VII, Section 1 to the extent that federal law is more expansive. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land . . . ."). But the change would eliminate confusion that may result from inconsistencies between the antiquated language of Article VII, Section 1 and other controlling law. *Compare* N.M. Const. art. VII, § 1 (limiting the right to vote to a citizen "over the age of twenty-one") *with* U.S. Const. amend. XXVI, § 1 ("The right of citizens of the United

States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.").

{48}	Second, the amendment would recognize the right of the legislative and executive branches to craft laws to define and expand the right to vote.  Currently, any state law that would expand voting qualifications beyond Article VII, Section 1 must be based in federal law.  *See, e.g.*, Uniform Military and Overseas Voters Act, NMSA 1978, §§ 1-6B-1 to -17 (2015) (setting forth procedures for complying with the federal Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410, 100 Stat. 928-29 (1986)).  The amendment would permit voting rights to be expanded via the legislative process without having to wait for a change in controlling federal law.

{49}	And third, the amendment would shift to the legislative and executive branches the authority to define the circumstances under which an otherwise qualified voter may be excluded from voting as a result of a felony conviction or mental incapacity. In doing so, the amendment would eliminate the exception in Article VII, Section 1 for a person convicted of an "infamous crime," and would provide a more precise—and far-less offensive—description of who may be excluded due to mental incapacity.  These changes would empower the political branches to define the voting

41

rights of convicted felons and mentally incapacitated individuals, consistent with the narrower restrictions of the amended constitutional provision.

{50} None of these changes would restrict the right to vote as previously set forth in Article VII, Section 1. We therefore conclude that the 2010 amendment was effective, having passed with more than 50 percent of the popular vote.

**3. Article VII, Section 1, as Amended, Incorporates the 2010 and the 2014 Amendments**

{51} As a final matter, we clarify that Article VII, Section 1, as amended through this proceeding, incorporates both the 2010 and the 2014 amendments. We emphasize the point to avoid confusion about the effect of the 2014 amendments, which were approved by the voters with the amended language about the timing of school elections *and* with the pre-2010 language about voter qualifications in the first sentence of Article VII, Section 1. *See* 2013 N.M. Laws, H.R.J. Res. 2, § 1 at 2569. Taken in context, the most sensible explanation for including the pre-2010 language in the 2014 amendment is the Compilation Commission's failure to compile the 2010 amendment. But an alternate reading of the 2014 amendment could lead to the conclusion that the Legislature—or perhaps even the voters—intended to repeal the 2010 amendment and restore the previous language about voter qualifications. We therefore clarify that the 2014 amendment had no effect on the 2010 amendment.

42

{52} Under well-established law, the 2014 amendment, which was initiated by the Legislature, could not have amended the language about the timing of school elections *and* repealed the 2010 amendment without being submitted separately to the voters. *See* N.M. Const. Art. XIX, § 1 ("If two or more amendments are initiated by the legislature, they shall be so submitted as to enable the electors to vote on each of them separately."); *see also State ex rel. Clark v. State Canvassing Bd.*, 1995-NMSC-001, ¶ 8, 119 N.M. 12, 888 P.2d 458 ("The purpose of this provision [in Article XIX, Section 1] is to prevent the abusive practice of 'logrolling' . . . .").

{53} Moreover, even if the two amendments could have been submitted as a single ballot question, the 2014 amendment did not suggest to the voters that the amendment was intended to affect anything but the timing of school elections. *See* 2013 N.M. Laws, H.R.J. Res. 2 at 2569 ("A Joint Resolution Proposing to Amend Article 7, Section 1 of the Constitution of New Mexico to Provide That School Elections Shall Be Held at Different Times From Partisan Elections"). Without such notice, the effect of the 2014 amendment was limited to the timing of school elections. *Cf. Clark*, 1995-NMSC-001, ¶ 25 ("[A] ballot title should be intelligible, and impartial . . . [and] complete enough to convey an intelligible idea of the scope and import of the proposed law[,] and be free from any misleading tendency whether of

43

amplification, of omission, or of fallacy." (alteration in original) (internal quotation marks and citation omitted)).

{54} We therefore ordered Respondent to advise and approve the compilation of Article VII, Section 1 to include both amendments as follows:

> A. Every person who is a qualified elector pursuant to the constitution and laws of the United States and a citizen thereof shall be qualified to vote in all elections in New Mexico, subject to residency and registration requirements provided by law, except as restricted by statute either by reason of criminal conviction for a felony or by reason of mental incapacity, being limited only to those persons who are unable to mark their ballot and who are concurrently also unable to communicate their voting preference. The legislature may enact laws providing for absentee voting by qualified electors. All school elections shall be held at different times from partisan elections.
>
> B. The legislature shall have the power to require the registration of the qualified electors as a requisite for voting and shall regulate the manner, time and places of voting. The legislature shall enact such laws as will secure the secrecy of the ballot and the purity of elections and guard against the abuse of elective franchise. Not more than two members of the board of registration and not more than two judges of election shall belong to the same political party at the time of their appointment.

*State ex rel. League of Women Voters v. Advisory Comm. to the N.M. Compilation Comm'n*, *writ granted*, No. 35,524 (Sept. 21, 2016).

**III. Conclusion**

{55} **IT IS SO ORDERED.**

44

_____

**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____

**JUDITH K. NAKAMURA, Chief Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**

_____

**BARBARA J. VIGIL, Justice**

45