# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:**_____

**Filing Date:  December 13, 2018**

**NO. S-1-SC-34974**

**CATHY MOSES AND PAUL F.
WEINBAUM,**

Plaintiffs-Petitioners,

v.

**CHRISTOPHER RUSZKOWSKI,
Secretary of Education, New Mexico
Public Education Department,**

Defendant-Respondent,

and

**ALBUQUERQUE ACADEMY, et al.,**

Defendants/Intervenors-Respondents.

**ORIGINAL PROCEEDING ON CERTIORARI
Sarah M. Singleton, District Judge**

Graeser & McQueen, LLC
Christopher L. Graeser
Santa Fe, NM

Frank Susman

Santa Fe, NM

for Petitioners


New Mexico Public Education Department
Dawn E. Mastalir, General Counsel
Santa Fe, NM

Sutin, Thayer & Browne, P.C.
Susan M. Hapka
Albuquerque, NM

for Respondent


Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Rufus E. Thompson
Jennifer G. Anderson
Sarah M. Stevenson
Albuquerque, NM

The Becket Fund for Religious Liberty
Eric S. Baxter
Washington, DC

for Intervenors-Respondents

**OPINION**

**VIGIL, Justice.**

{1}     In this opinion we reconsider the constitutionality of New Mexico's textbook loan program. In *Moses v. Skandera* (*Moses II*), this Court considered whether using public funds to lend textbooks to private school students violated Article XII, Section 3 support of any sectarian, denominational or private school, college or university." 2015-NMSC-036, 367 P.3d 838, *vacated sub nom.*, *N.M. Ass'n of Non-public Sch. v. Moses*, 137 S. Ct. 2325 (2017) (mem.). This Court held "that the plain meaning and history of Article XII, Section 3 forbids the provision of books for use by students attending private schools, whether such schools are secular or sectarian." *Moses II*, 2015-NMSC-036, ¶ 2. The United States Supreme Court subsequently vacated this Court's judgment and remanded the case for further consideration in light of *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. ___, 137 S. Ct. 2012 (2017). *N.M. Ass'n of Non-public Sch.*, 137 S. Ct. 2325.

{2}     On remand, we conclude that this Court's previous interpretation of Article XII, Section 3 raises concerns under the Free Exercise Clause of the First Amendment to the United States Constitution. To avoid constitutional concerns, we hold that the textbook loan program, which provides a generally available public benefit to students, does not result in the use of public funds in support of private schools as

prohibited by Article XII, Section 3. We also hold that the textbook loan program is consistent with Article IV, Section 31 of the New Mexico Constitution, which addresses appropriations for educational purposes, and Article IX, Section 14 of the New Mexico Constitution, which limits "any donation to or in aid of any person, association or public or private corporation."

## I.    BACKGROUND

{3}    Cathy Moses and Paul F. Weinbaum (Petitioners) initiated this case by filing a complaint for declaratory judgment against Hanna Skandera, the Secretary of the New Mexico Public Education Department (Department).[1] Petitioners sought a declaration that the Instructional Material Law (IML), NMSA 1978, §§ 22-15-1 to -14 (1967, as amended through 2011), violates several provisions of the New Mexico Constitution because the IML provides for the distribution of public funds to private schools.

{4}    The IML establishes an instructional material fund that is administered by the Department. *See* § 22-15-5(A). The Department uses the fund to purchase textbooks that are loaned free of charge to public and private school students enrolled in first

---

[1]Christopher Ruszkowski, the current Secretary of Education, has been substituted for Hanna Skandera on remand.

through twelfth grades and in early childhood education programs. *See* §§ 22-15-5(B), 22-15-7(A); *see also* § 22-15-2(C) (defining "instructional material," which is referred to collectively in this opinion as "textbooks"). Although schools play a role in the implementation of the IML, they do so as agents for the benefit of their students. *See* §§ 22-15-7(B), 22-15-8(B). The Department allocates the money in the instructional material fund to schools based on the number of students enrolled. *See* § 22-15-9(A). The schools select textbooks from a "multiple list" approved by the Department. *See* §§ 22-15-2(D), 22-15-8(B). The IML permits schools to use a portion of their allocated funds for the purchase of instructional materials, classroom materials, and "items that are not on the multiple list; provided that no funds shall be expended [by a private school] for religious, sectarian or nonsecular materials." Section 22-15-9(C). The Department distributes the textbooks to the schools, *see* § 22-15-7(B), and the schools disseminate the textbooks to their students, *see* § 22-15-7(C). Schools are responsible for the safekeeping of the textbooks, *id.*, and may hold a student or parent "responsible for the loss, damage or destruction of" a textbook that is "in the possession of the student." Section 22-15-10(B).

{5}     Petitioners moved for summary judgment in the district court. At a summary judgment hearing, the district court indicated that it intended to grant the motion

based on *Zellers v. Huff*, 1951-NMSC-072, 55 N.M. 501, 236 P.2d 949 (addressing issues concerning public funding of parochial schools and Catholic influence in public schools). But before the district court entered summary judgment, Intervenors, the Albuquerque Academy, the New Mexico Association of Non-public Schools, Rehoboth Christian School, St. Francis School, Hope Christian School, Sunset Mesa School, and Anica and Maya Benia moved to intervene. The district court granted the motion to intervene and ordered the parties to submit additional briefing on whether *Zellers* precluded the use of IML funds to purchase textbooks for distribution to private schools. At a second summary judgment hearing, the district court concluded that *Zellers* did not constitute binding or persuasive authority, denied Petitioners' motion for summary judgment, and granted summary judgment in favor of the Department. The Court of Appeals affirmed. *Moses v. Skandera* (*Moses I*), 2015-NMCA-036, ¶ 2, 346 P.3d 396, *rev'd*, 2015-NMSC-036, ¶¶ 12, 41.

{6}     Petitioners sought review by this Court, raising five issues:

> (1) whether this Court's decision in *Zellers* constituted dicta; (2) whether the IML violates Article XII, Section 3 of the New Mexico Constitution; (3) whether the IML violates Article IV, Section 31 of the New Mexico Constitution; (4) whether the IML violates Article IX, Section 14 of the New Mexico Constitution; and (5) whether the IML violates Article II, Section 11 of the New Mexico Constitution.

4

*Moses II*, 2015-NMSC-036, ¶ 11. This Court held that loaning textbooks to private school students violated Article XII, Section 3 and declined to reach the remaining issues. *Moses II*, 2015-NMSC-036, ¶ 12.

{7}  The New Mexico Association of Non-public Schools filed a petition for a writ of certiorari in the United States Supreme Court. The day after the Supreme Court issued its opinion in *Trinity Lutheran*, 137 S. Ct. 2012, the Supreme Court granted review of this Court's opinion in *Moses II*, vacated this Court's judgment, and remanded the case to this Court for further consideration in light of *Trinity Lutheran*. *See N.M. Ass'n of Non-public Sch.*, 137 S. Ct. 2325. In accordance with the Supreme Court's directive, in this opinion we take a fresh look at the constitutionality of the textbook loan program under the New Mexico Constitution.

**II.   DISCUSSION**

{8}  On remand, Petitioners argue that loaning textbooks to private school students under the IML violates three provisions of the New Mexico Constitution: (1) Article XII, Section 3, which prohibits the use of public funds "for the support of any sectarian, denominational or private school, college or university"; (2) Article IV, Section 31, which precludes an appropriation for "educational . . . purposes to any person, corporation, association, institution or community, not under the absolute

5

control of the state"; and (3) Article IX, Section 14, which limits "any donation to or in aid of any person, association or public or private corporation."

{9} The Department and Intervenors argue that Article XII, Section 3, as interpreted by the Court in *Moses II*, violates the Free Exercise Clause of the First Amendment to the United States Constitution and the equal protection guarantees of the federal and state constitutions. They ask this Court to interpret Article XII, Section 3 in a manner that permits the state to loan textbooks to private school students under the IML and assert that such an interpretation would be consistent with the United States Constitution.

**A.     Standard of Review**

{10} This Court applies a de novo standard of review to a constitutional challenge to a statute. *Bounds v. State ex rel. D'Antonio*, 2013-NMSC-037, ¶ 11, 306 P.3d 457. In doing so, we presume that the statute is valid and will uphold it "unless we are satisfied beyond all reasonable doubt that the Legislature went outside the bounds fixed by the Constitution in enacting the challenged legislation." *Id.* (internal quotation marks and citation omitted). "We will not question the wisdom, policy, or justness of a statute, and the burden of establishing that the statute is invalid rests on the party challenging the constitutionality of the statute." *Id.* (internal quotation marks

and citation omitted).

**B.    Loaning Textbooks to Private School Students Under the IML Does Not Constitute Support of Private Schools as Prohibited by Article XII, Section 3**

**1.    This Court's previous interpretation of Article XII, Section 3 in *Moses II***

{11}    This Court based its decision in *Moses II*, 2015-NMSC-036, on Article XII, Section 3 of the New Mexico Constitution, which provides that

> [t]he schools, colleges, universities and other educational institutions provided for by this constitution shall forever remain under the exclusive control of the state, and no part of the proceeds arising from the sale or disposal of any lands granted to the state by congress, or any other funds appropriated, levied or collected for educational purposes, shall be used for the support of any sectarian, denominational or private school, college or university.

To determine whether loaning textbooks to private school students constituted support of private schools in violation of Article XII, Section 3, this Court considered the historical circumstances that led to the provision's adoption, including the nationwide controversy over public education. *See Moses II*, 2015-NMSC-036, ¶¶ 19-23.

{12}    "During the early nineteenth century, public education was provided in public schools known as common schools." *Moses II*, 2015-NMSC-036, ¶ 19 (internal quotation marks and citation omitted). These common schools were heavily

influenced by non-denominational Protestantism. *See* Mark Edward DeForrest, *An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns*, 26 Harv. J.L. & Pub. Pol'y 551, 559-60 (2003) (describing the "overt fusion of Protestant faith with public education"); Joseph P. Viteritti, *Blaine's Wake: School Choice, The First Amendment, and State Constitutional Law*, 21 Harv. J.L. & Pub. Pol'y 657, 666 (1998) (noting that the common schools promoted "the teachings of mainstream Protestantism"). The Protestant-run common schools were " 'designed to function as an instrument for the acculturation of immigrant populations, rendering them good productive citizens in the image of the ruling majority.' " *Moses II*, 2015-NMSC-036, ¶ 19 (quoting Viteritti, *supra*, at 668). "State statutes at the time authorized Bible readings in public schools and state judges generally refused to recognize the Bible as a sectarian book." *Id.*

{13}     "By the middle of the nineteenth century," an "influx of Catholic immigrants created a demand for Catholic education, and consequently Catholics and other minority religionists challenged the Protestant influence in the common schools." *Id.* ¶ 20. Protestants responded by "calling for legislation prohibiting sectarian control over public schools and the diversion of public funds to religious institutions." Steven K. Green, *The Blaine Amendment Reconsidered*, 36 Am. J. Legal Hist. 38, 43 (1992).

President Ulysses S. Grant entered the debate by vowing to " '[e]ncourage free schools, and resolve that *not one dollar be appropriated to support any sectarian schools.*' " *Moses II*, 2015-NMSC-036, ¶ 21 (alteration in original) (emphasis added) (quoting Viteritti, *supra*, at 670). At that time, "[i]t was an open secret that 'sectarian' was code for 'Catholic.' " *Id.* (internal quotation marks and citation omitted).

{14}     In 1875, Congressman James G. Blaine proposed the following amendment to the federal constitution:

> No State shall make any law respecting an establishment of religion, or prohibiting the free exercise thereof; and no money raised by taxation in any State for the support of public schools, or derived from any public fund therefor, [nor] any public lands devoted thereto, shall ever be under the control of any religious sect; nor shall any money so raised or lands so devoted be divided between religious sects or denominations.

Green, *supra*, at 38 n.2 (quoting 4 Cong. Rec. 5453 (1876)). This proposed amendment to the federal constitution failed to pass, but similar provisions were soon incorporated into state law. *Moses II*, 2015-NMSC-036, ¶ 23. "By 1876, fourteen [s]tates had enacted legislation prohibiting the use of public funds for religious schools; by 1890, twenty-nine [s]tates had incorporated such provisions into their constitutions." Viteritti, *supra*, at 673.

{15}     Although many states voluntarily chose to adopt state constitutional provisions

based on the failed Blaine amendment, Congress forced New Mexico and other territories seeking admission to the union to adopt Blaine provisions as a condition of statehood. *See* DeForrest, *supra*, at 573-74; Viteritti, *supra*, at 673. Congress passed the Enabling Act for New Mexico in 1910. *See* Enabling Act for New Mexico of June 20, 1910, ch. 310, 36 Stat. 557. The Enabling Act required New Mexico to establish and maintain "a system of public schools . . . free from sectarian control," *id.* § 2, and granted New Mexico "over thirteen million acres of federal land . . . to be held in trust for the benefit of various public schools and other institutions." *State of N.M. ex rel. King v. Lyons*, 2011-NMSC-004, ¶ 5, 149 N.M. 330, 248 P.3d 878. The Enabling Act further mandated

> [t]hat the schools, colleges, and universities provided for in this Act shall forever remain under the exclusive control of the said State, and no part of the proceeds arising from the sale or disposal of any lands granted herein for educational purposes shall be used for the support of any sectarian or denominational school, college, or university.

Enabling Act § 8. "The Enabling Act required that the people of New Mexico incorporate its mandates into the state constitution, and it specified that those mandates could not be modified without the consent of Congress and a ratifying vote of our citizens." *Lyons*, 2011-NMSC-004, ¶ 4; *see also* N.M. Const. art. XXI, § 9 (consenting to Enabling Act provisions); N.M. Const. art. XXI, § 10 (making

Enabling Act provisions "irrevocable without the consent of the United States and the people of this state").

{16}     The drafters of the New Mexico Constitution modeled Article XII, Section 3 on Section 8 of the Enabling Act but made two significant changes to the language drafted by Congress. First, Article XII, Section 3 restricts "the use of proceeds from *any* lands granted to New Mexico by Congress, not only those granted in the Enabling Act." *Moses II*, 2015-NMSC-036, ¶ 27. And second, Article XII, Section 3 restricts "the use of any funds appropriated, levied, or collected for educational purposes for the support of not only sectarian schools, but also the *much broader category of private schools*." *Moses II*, 2015-NMSC-036, ¶ 27 (emphasis added). "Through these changes, the Constitutional Convention decided to provide for additional restrictions on public funding of education beyond the restrictions required by Section 8 of the Enabling Act." *Moses II*, 2015-NMSC-036, ¶ 27. "The members of the Constitutional Convention chose to play it safe—by broadening the provision to reach all private schools, they avoided drawing a line between secular and sectarian education." *Id.*

{17}     In *Moses II*, this Court considered two interpretations of Article XII, Section 3: a permissive interpretation that would allow the state to lend textbooks to private

11

school students under the IML, and a restrictive interpretation that would preclude such lending. *Moses II*, 2015-NMSC-036, ¶¶ 30-38. Our Court of Appeals had taken the permissive approach, construing the limitations in Article XII, Section 3 as coextensive with the limitations set forth in the Establishment Clause of the First Amendment to the United States Constitution. *See Moses I*, 2015-NMCA-036, ¶ 34. The Court of Appeals explained that the Establishment Clause, which prohibits Congress from making any law "respecting an establishment of religion," U.S. Const. amend. I, does not bar a state from creating a textbook loan program that provides secular instructional material for the benefit of students and their parents, "regardless of the school of their attendance." *See Moses I*, 2015-NMCA-036, ¶¶ 34-38. The Court of Appeals concluded that although the IML may provide incidental or indirect benefits to private schools, the IML does not violate Article XII, Section 3 because students and their parents "are the direct recipients of the program's financial support." *Moses I*, 2015-NMCA-036, ¶¶ 39-40.

{18} On certiorari, this Court observed that Article XII, Section 3 "stands as a constitutional protection separate from the Establishment Clause" because it prohibits the use of public funds for all private schools, not just religious schools. *Moses II*, 2015-NMSC-036, ¶¶ 17-18. This Court concluded that "Article XII, Section 3 must

12

be interpreted consistent with cases analyzing similar Blaine amendments under state constitutions." *Moses II*, 2015-NMSC-036, ¶ 32. State courts considering the constitutionality of similar textbook loan programs have reached different results.

{19}     Some jurisdictions have concluded that the Blaine provisions in their state constitutions permit a textbook loan program despite incidental or collateral benefits to religious schools. *See, e.g.*, *Borden v. La. State Bd. of Educ.*, 123 So. 655, 660-61 (La. 1929); *Chance v. Miss. State Textbook Rating & Purchasing Bd.*, 200 So. 706, 713 (Miss. 1941) (in banc); *Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 228 N.E.2d 791, 793-94 (N.Y. 1967), *aff'd*, 392 U.S. 236 (1968). These jurisdictions have emphasized that textbook loan programs are intended to benefit the student, not the school, and that such programs advance the state's legitimate public welfare concern in promoting education. *See Borden*, 123 So. at 660-61 (concluding that school children and the state, but not the schools, were the beneficiaries of the program); *Chance*, 200 So. at 713 (concluding that lending secular textbooks to "individual pupils" did not provide "a direct or indirect aid to the respective schools which they attend" and that any benefit to the school was only incidental); *Allen*, 228 N.E.2d at 794 (explaining that the textbook program was intended to "bestow a public benefit upon all school children" and that "any benefit accruing to" religious schools was

merely "a collateral effect" that "cannot be properly classified as the giving of aid directly or indirectly").

{20} Other states have chosen a more restrictive approach, interpreting the Blaine provisions in their state constitutions to preclude the provision of any aid or benefit to private religious schools. *See, e.g.*, *Cal. Teachers Ass'n v. Riles*, 632 P.2d 953, 964 (Cal. 1981); *Spears v. Honda*, 449 P.2d 130, 135-36 (Haw. 1968); *Bloom v. Sch. Comm. of Springfield*, 379 N.E.2d 578, 581-82 (Mass. 1978); *Paster v. Tussey*, 512 S.W.2d 97, 104-05 (Mo. 1974) (en banc); *Gaffney v. State Dep't of Educ.*, 220 N.W.2d 550, 554 (Neb. 1974); *Dickman v. Sch. Dist. No. 62C, Or. City, of Clackamas Cty*, 366 P.2d 533, 541-42 (Or. 1961) (en banc); *In re Certification of a Question of Law from the U.S. Dist. Court, Dist. of S.D., S. Div.*, 372 N.W.2d 113, 116, 118 (S.D. 1985). These courts have reasoned that textbook loan programs help religious schools fulfill their religious mission. *See Cal. Teachers Ass'n*, 632 P.2d at 962-63 ("[I]t is an undeniable fact that books are a critical element in enabling the school to carry out its essential mission to teach the students."); *Dickman*, 366 P.2d at 544 (noting that textbooks are an "integral part of the educational process" and that the teaching of religious precepts is an inseparable part of that process).

{21} Faced with two competing interpretations of Article XII, Section 3, this Court

concluded that the more restrictive approach honored the intent behind the failed Blaine amendment and the mandate set forth in the Enabling Act to ensure that no public funds are used to support sectarian schools. *See Moses II*, 2015-NMSC-036, ¶¶ 21, 27, 32. In reaching that conclusion, this Court did not attach any significance to the inclusion of private schools in Article XII, Section 3; the restrictive approach flowed from the intent underlying the Blaine amendment and the Enabling Act and applied equally to sectarian and private schools. This Court thus held "that the plain meaning and history of Article XII, Section 3 forbids the provision of books for use by students attending private schools, whether such schools are secular or sectarian." *Moses II*, 2015-NMSC-036, ¶ 2.

**2.      Evolving First Amendment Law and *Trinity Lutheran***

{22}      The religion clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. On remand we must consider whether this Court's interpretation of Article XII, Section 3 in *Moses II* conflicts with the First Amendment principles enunciated by the United States Supreme Court in *Trinity Lutheran*, 137 S. Ct. 2012.

{23}      The Supreme Court described the relationship between the religion clauses in

15

*Everson v. Board of Education of Ewing Township*, 330 U.S. 1 (1947). *Everson* involved a New Jersey program that reimbursed parents for school bus fares incurred by both public and private school students, including students who attended religious schools. *Id.* at 3. The Court opined that "New Jersey cannot consistently with the [Establishment Clause] contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church." *Id.* at 16. "On the other hand, [the Free Exercise Clause] commands that New Jersey cannot hamper its citizens in the free exercise of their own religion." *Id.* Given these competing concerns, the Court was "careful, in protecting the citizens of New Jersey against state-established churches, to be sure that [it did] not inadvertently prohibit New Jersey from extending its general [s]tate law benefits to all its citizens without regard to their religious belief." *Id.* The Court concluded that the Establishment Clause did not prohibit New Jersey from providing bus fares to religious school students "as a part of a general program." *Id.* at 17. The Court explained that the state must remain "neutral in its relations with groups of religious believers and non-believers" when providing "general government services," such as "police and fire protection, connections for sewage disposal, public highways and sidewalks." *Id.* at 17-18.

{24}     Since *Everson*, the Supreme Court has issued multiple opinions analyzing

whether the Establishment Clause permits the government to provide benefits or aid to religious schools or their students. *See, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639, 644-45, 652, 663 (2002) (upholding a publicly financed school voucher program that was neutral with respect to religion and provided aid to families who exercised an independent choice regarding whether to enroll in public or private school); *Mitchell v. Helms*, 530 U.S. 793, 801, 829, 835 (2000) (plurality opinion) (upholding a program that loaned secular educational materials to public and private schools on the basis of neutral, secular criteria); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 3,13-14 (1993) (permitting a local school district to provide a publicly employed interpreter for a deaf student who attended parochial school); *Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 238, 243 (1968) (upholding a New York law under which secular textbooks were loaned to public and private school students).

{25}     While there have been many opinions addressing whether the Establishment Clause *permits* a state to provide aid or benefits to a religious school or its students, the Supreme Court has only recently begun to consider the circumstances under which the Free Exercise Clause *requires* a state to do so. In *Locke v. Davey*, the Court analyzed a Washington scholarship program that prohibited recipients from using

17

scholarship money to pursue "a degree in devotional theology." 540 U.S. 712, 715 (2004). The Court concluded that the Establishment Clause permitted Washington to give scholarship money to theology students because "the link between government funds and religious training [was] broken by the independent and private choice of recipients." *Id.* at 719. But the Court held that Washington could nonetheless exclude theology students from the scholarship program under the Washington Constitution without violating the Free Exercise Clause. *Id.* at 725. The Court explained Washington's restrictions on scholarship recipients fell into the "play in the joints" between what the Establishment Clause permits and the Free Exercise Clause requires. *Id.* at 718-19 (internal quotation marks and citation omitted). In other words, although Washington could give scholarship money to recipients pursuing a degree in theology without violating the Establishment Clause, it did not have to do so. Washington's interest against "funding religious instruction" to "prepare students for the ministry" provided a valid basis for excluding theology students from the scholarship program and did not violate their rights under the Free Exercise Clause. *Id.* at 719; *see also id.* at 725 ("If any room exists between the two Religion Clauses, it must be here.").

{26}     In *Trinity Lutheran*, the Supreme Court considered whether the Free Exercise

18

Clause required Missouri to include religious schools in a program that provided grants to schools and other entities to resurface playgrounds with recycled tire rubber. 137 S. Ct. at 2017. The preschool at Trinity Lutheran Church applied for a grant, but the state deemed the preschool categorically ineligible to receive a grant based on restrictions set forth in article I, section 7 of the Missouri Constitution. *Trinity Lutheran*, 137 S. Ct. at 2017-18. Article I, section 7 provides

> [t]hat no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.

Trinity Lutheran Church sued, arguing that Missouri's policy of denying grants based on the religious identity of the applicant violated the Free Exercise Clause. *Trinity Lutheran*, 137 S. Ct. at 2018. The federal district court ruled in favor of the state, reasoning that the case was controlled by *Locke* and that the Free Exercise Clause did "not prohibit withholding an affirmative benefit on account of religion." *Trinity Lutheran*, 137 S. Ct. at 2018. The Eighth Circuit Court of Appeals affirmed, concluding that the Free Exercise Clause did not compel Missouri "to disregard the antiestablishment principle" embodied in its state constitution. *Id.* at 2018-19.

19

{27} The Supreme Court reversed, holding that Missouri's policy of excluding religious entities from the grant program violated the Free Exercise Clause. *Id.* at 2024. The Court confirmed that a state's denial of "a generally available benefit solely on account of religious identity" violates the Free Exercise Clause unless "justified . . . by a state interest of the highest order." *Id.* at 2019 (internal quotation marks and citation omitted). The Court concluded that Missouri's policy implicated the Free Exercise Clause because it "expressly discriminate[d] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 2021. The Court also determined that Missouri's interest in "skating as far as possible from religious establishment concerns" was insufficient to justify its discriminatory policy. *Id.* at 2024. The Court did not analyze the constitutionality of the Missouri policy under the Establishment Clause because the parties stipulated that Missouri could provide playground resurfacing grants to religious preschools without violating the Establishment Clause. *Id.* at 2019. *But see id.* at 2028 (Sotomayor, J. dissenting) (opining that the Establishment Clause precluded Missouri from giving a grant to the church for playground resurfacing because the church uses its facilities "to practice and spread its religious views"). We discuss the holding and implications of *Trinity Lutheran* later in this opinion.

20

**3.      Reconsideration of *Moses II* in light of *Trinity Lutheran***

{28}      Petitioners argue that *Trinity Lutheran* does not require reversal of this Court's holding in *Moses II* because Article XII, Section 3 treats all private schools alike, whether religious or secular, and does not discriminate "solely on account of religious identity." *See Trinity Lutheran*, 137 S. Ct. at 2019. The Department and Intervenors argue that despite its facial neutrality, Article XII, Section 3, as interpreted by this Court in *Moses II*, violates the Free Exercise Clause because Article XII, Section 3 was adopted as a result of animus toward Catholics. The Department and Intervenors also assert that the decisions from other states on which this Court relied in *Moses II*, 2015-NMSC-036, ¶¶ 32-38, are suspect following *Trinity Lutheran*.

{29}      In *Trinity Lutheran*, the Supreme Court changed the landscape of First Amendment law. Under *Trinity Lutheran*, if a state permits private schools to participate in a generally available public benefit program, the state must provide the benefit to religious schools on equal terms. *See* 137 S. Ct. at 2022 ("The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant."). *Trinity Lutheran* was the first Supreme Court opinion to hold that the Free Exercise Clause required a state to provide public funds

directly to a religious institution. *See* 137 S. Ct. at 2027 (Sotomayor, J., dissenting) ("The Court today profoundly changes [the] relationship [between church and state] by holding, for the first time, that the Constitution requires the government to provide public funds directly to a church."). The Supreme Court also emphasized that a state's interest in maintaining church-state separation does not justify the withholding of generally available public benefits based on the religious status of the recipient. *Id.* at 2024.

{30}     Like the grant program at issue in *Trinity Lutheran*, the textbook loan program under the IML is a generally available public benefit program. *See Moses II*, 2015-NMSC-036, ¶ 28 (acknowledging "that the provision of school books for children attending both public and private schools constitutes 'a public service' "). And this Court in *Moses II*, like Missouri in *Trinity Lutheran*, limited the availability of the program based on restrictions in our state constitution on the expenditure of public funds.

{31}     But there is a critical difference between Article XII, Section 3 of the New Mexico Constitution and article I, section 7 of the Missouri Constitution. Specifically, Article XII, Section 3 of the New Mexico Constitution does not make a distinction based solely on religious status, whereas article I, section 7 of the Missouri

22

Constitution does. *Compare* N.M. Const. art. XII, § 3 (providing that no "funds appropriated, levied or collected for educational purposes, shall be used for the support of any sectarian, denominational or private school, college or university"), *with* Mo. Const. art. I, § 7 (providing "[t]hat no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion").

{32}     Article XII, Section 3, as interpreted in *Moses II*, 2015-NMSC-036, enunciates a facially neutral policy of prohibiting the expenditure of public funds to support private schools, both religious and secular. Article XII, Section 3 does not disqualify religious individuals or entities from receiving public benefits based solely on their religious status. Instead, it creates a distinction between public schools and private schools. The First Amendment requires government neutrality toward religious viewpoints; it does not require the state to treat public schools and private schools alike.

{33}     Although Article XII, Section 3 is facially neutral toward religion, the Free Exercise Clause may still be implicated if its adoption was motivated by religious animus. In *Trinity Lutheran*, the Supreme Court recognized a distinction between laws that "single out the religious for disfavored treatment" and laws that are "neutral

23

and generally applicable without regard to religion." 137 S. Ct. at 2020. "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). But "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533. "Facial neutrality is not determinative." *Id.* at 534. The Free Exercise Clause "forbids subtle departures from neutrality and covert suppression of particular religious beliefs." *Id.* (internal quotation marks and citations omitted).

{34}     Evolving First Amendment jurisprudence suggests that courts should consider the historical and social context underlying a challenged government action to determine whether the action was neutral or motivated by hostility toward religion. "Factors relevant to the assessment of governmental neutrality include the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (internal quotation marks and citation omitted); *see id.*

24

at 1729-31 (citing hostile comments from members of the Colorado Civil Rights Commission and the commission's inconsistent treatment of religious discrimination and sexual-orientation discrimination to conclude that the commission's treatment of a cake shop owner "violated the [s]tate's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint"); *Trump v. Hawaii*, 138 S. Ct. 2392, 2417 (2018) (considering extrinsic evidence of anti-Muslim animus when determining the constitutionality of a presidential proclamation).

{35}  In *Moses II*, this Court acknowledged that the federal Blaine amendment originated in anti-Catholic prejudice and that Congress, through the Enabling Act, forced New Mexico to adopt a Blaine provision as a condition of statehood. *Moses II*, 2015-NMSC-036, ¶¶ 19-24. The United States Supreme Court likewise has recognized that the federal Blaine amendment was a product of anti-Catholic animus. *See Mitchell*, 530 U.S. at 828 ("Consideration of the amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that 'sectarian' was code for 'Catholic.' "); *see also Zelman*, 536 U.S. at 720-21 (Breyer, J., dissenting) (explaining that "the Protestant position . . . was that public schools must be nonsectarian (which was usually understood to allow Bible reading and other Protestant observances) and public money must not support

25

sectarian schools (which in practical terms meant Catholic") (internal quotation marks and citation omitted)). This history casts constitutional doubt on the motive underlying Article XII, Section 3. We therefore consider whether the history or circumstances in New Mexico that led to the adoption of Article XII, Section 3 cured the provision's anti-Catholic origins.

**4.     History of public and sectarian schools in New Mexico**

{36}     New Mexico has a unique history and culture, and the public school debate within New Mexico took a different course than the debate at the national level. Formal schooling commenced in New Mexico with the arrival of the first Franciscan missionaries over four hundred years ago. *See* Kathleen Holscher, *Religious Lessons: Catholic Sisters and the Captured Schools Crisis in New Mexico* 28 & 206 n.13 (2012). "Under both Spanish and Mexican rule, the Roman Catholic Church . . . handled all education with little interference from secular forces." Robert W. Larson, *New Mexico's Quest for Statehood: 1846-1912* 101 (1968). During that time period, "New Mexico's remote location, its rugged landscape, and its struggling economy made a centralized system of schools no more than a far-off hope." Holscher, *supra*, at 28.

{37}     In 1848, Mexico ceded present-day New Mexico to the United States, and in

1850, New Mexico became a territory. *See* Treaty of Peace, Friendship, Limits, and Settlement With the Republic of Mexico (Treaty of Guadalupe Hidalgo), 9 Stat. 922 (1848); *Torrez v. Bd. of Cty. Comm'rs, Socorro Cty.*, 1901-NMSC-002, ¶ 3, 10 N.M. 670, 65 P. 181. When New Mexico became a territory, the overwhelming majority of its population consisted of native-born New Mexicans. *See* Holscher, *supra*, at 31 ("In 1850, ninety-five percent of New Mexico's population was native born, either Hispano or Native American."). Catholic Church leaders established new parochial schools during the early territorial days, and the Church maintained control over education in New Mexico into the 1870s. *See* Dianna Everett, *The Public School Debate in New Mexico: 1850-1891*, 26 Arizona and the West 107, 108-09 (1984) (describing the work of "the first bishop of the Diocese of Santa Fe, John B. Lamy," and "Father Donato Maria Gasparri, Superior of the Society of Jesus in New Mexico"). Both New Mexico's public schools and its parochial schools employed members of the Catholic clergy as teachers and used textbooks published by a Catholic printing press. *See* Howard R. Lamar, *The Far Southwest 1846-1912: A Territorial History* 144-45 (rev. ed. 2000); *see also* Holscher, *supra*, at 38 (explaining that "schools taught by Catholic religious" were some of the first to receive public funding and that a Jesuit printing press "supplied textbooks to many of the territory's

tax-supported schools"). New Mexico remained "overwhelmingly Spanish-American in culture . . . and Roman Catholic in religion" throughout the territorial period. *See* Lamar, *supra*, at 3.

{38} Although native New Mexicans remained a majority, the number of Anglo-American Protestants in New Mexico increased significantly between 1850 and 1910. *See* Holscher, *supra*, at 31. "Anglo-American transplants to New Mexico introduced a series of proposals for public education." Holscher, *supra*, at 26. These proposals met resistance because they "relied on the familiarly Protestant objection to sectarianism" and sought "to eliminate Catholic influence." *Id.* at 38, 40; *see also* Lamar, *supra*, at 144-45, 162-64 (describing opposition to public school proposals by Catholic Church leaders and Spanish-American members of the legislature); Charles E. Smith, *The New Mexico State Constitution* 13 (2011) ("[T]he Catholic Church had enjoyed the position of primacy in education for three centuries, and Catholic leaders were suspicious of public schools."). "Between 1850 and 1891, New Mexico's government failed at multiple attempts to inaugurate a system of tax-supported schools." Holscher, *supra*, at 37. The ongoing debate over public education evidenced "mounting hostility between public education advocates and the Archdiocese of Santa Fe," Holscher, *supra*, at 38, and was one of the most pressing

problems facing the territorial legislature, *see* Larson, *supra*, at 65.

{39} Perceived problems with New Mexico's educational system and widespread illiteracy also posed obstacles to New Mexico becoming a state. *See* David V. Holtby, *Forty-Seventh Star: New Mexico's Struggle for Statehood* 54-55 (2012); Holscher, *supra*, at 38-39; Lamar, *supra*, at 162; Larson, *supra*, at 65, 124-25. Concerns about New Mexico's educational system were exacerbated by "strong prejudice toward [its] Spanish-speaking, Roman Catholic people." *See* Larson, *supra*, at 303-04; *see also State ex rel. League of Women Voters of N.M. v. Advisory Comm. to the N.M. Compilation Comm'n*, 2017-NMSC-025, ¶¶ 29, 32, 401 P.3d 734 (concluding that "decades of hostility toward New Mexico's Spanish-speaking population" delayed New Mexico's admission to the union); Larson, *supra*, at 124-25 (explaining that the "Catholicism of native New Mexicans was used in a particularly insidious way" and that the Catholic Church was implicated "in the high percentage of illiteracy"). "Anglo-Protestant apprehension about Catholic influence motivated official scrutiny of the Church's role in schooling as soon as New Mexico became part of the United States." Holscher, *supra*, at 37; *see also* Lamar, *supra*, at 144 (explaining that officials viewed New Mexico's schools with disfavor because classes were "Catholic in orientation" and taught in Spanish). "[B]y the last quarter of the century everyone

understood that the territory's prospects for joining the Union depended upon the condition of its educational system. Above all, statehood would require schools free from Catholic influence." Holscher, *supra*, at 38.

{40} In 1891, the territorial legislature passed "an act establishing common schools in the territory of New Mexico and creating the office of superintendent of public instruction." 1891 N.M. Laws, ch. 25. The 1891 act was "intended to establish a comprehensive and harmonious system of public schools throughout the territory." *Water Supply Co. of Albuquerque v. City of Albuquerque*, 1898-NMSC-023, ¶ 9, 9 N.M. 441, 54 P. 969. The 1891 act made school attendance compulsory and served as a precursor to the IML by authorizing free textbooks for a child whose "parent or guardian [was] not able by reason of poverty to buy books." 1891 N.M. Laws, ch. 25, § 42. In 1903, the 1891 act was amended to clarify that the textbooks were only loaned to the children and that ownership remained with the school districts. *See* 1903 N.M. Laws, ch. 39, § 2.

{41} When Congress passed the Enabling Act for New Mexico in 1910, New Mexico's centralized public school system had been in place for almost two decades. "New Mexico held a constitutional convention that same fall in Santa Fe, and nearly a third of the convention's one hundred elected delegates were native

30

Spanish-speakers." *State ex rel. League of Women Voters of N.M.*, 2017-NMSC-025, ¶ 32. The delegates drafted an array of constitutional provisions related to education. Consistent with the 1891 act, the New Mexico Constitution requires the state to establish and maintain a "uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state." N.M. Const. art. XII, § 1. The Constitution also includes explicit protections for the educational rights of New Mexico's Spanish-speaking citizens. *State ex rel. League of Women Voters of N.M.*, 2017-NMSC-025, ¶ 26; *see* N.M. Const. art. XII, § 8 ("The legislature shall provide for the training of teachers in the normal schools or otherwise so that they may become proficient in both the English and Spanish languages, to qualify them to teach Spanish-speaking pupils and students in the public schools and educational institutions of the state, and shall provide proper means and methods to facilitate the teaching of the English language and other branches of learning to such pupils and students."); N.M. Const. art. XII, § 10 ("Children of Spanish descent in the state of New Mexico shall never be denied the right and privilege of admission and attendance in the public schools or other public educational institutions of the state, and they shall never be classed in separate schools, but shall forever enjoy perfect equality with other children in all public schools and educational institutions of the

state, and the legislature shall provide penalties for the violation of this section."). The provisions protecting the educational rights of Spanish speakers were safeguarded with a heightened amendment requirement and cannot be changed without at least three-fourths of the popular vote in a statewide election. *State ex rel. League of Women Voters of N.M.*, 2017-NMSC-025, ¶¶ 25-26.

{42}     The constitutional delegation that incorporated explicit protections for Spanish-speaking students into the New Mexico Constitution also drafted Article XII, Section 3, which extended the Enabling Act's restrictions on public funding for "sectarian [and] nondenominational school[s]" to also include "private schools." We cannot ascertain what motivated the delegates to draft Article XII, Section 3. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (noting the difficulty of "determining the actual motivations of the various legislators" that make up a constitutional delegation); *see also* Smith, *supra*, at 17 (noting that no verbatim record was made of the constitutional convention). But under the circumstances, it appears that the drafters of Article XII, Section 3 intended to create a provision that would be acceptable to New Mexico voters while fulfilling the mandate set forth in the New Mexico Enabling Act. *See* Dorothy I. Cline, *New Mexico's 1910 Constitution: A 19th Century Product* 26-27, 45 n.31, 46 (1985) (explaining that despite a deep political

32

divide between Republicans and Democrats, the constitutional delegates "agreed it was essential to guarantee the civil, religious and political rights" of native New Mexicans). In the absence of sufficient proof that New Mexico adopted Article XII, Section 3 for a discriminatory purpose, we decline to impute an impermissible motive to the constitutional delegation and New Mexico voters, who approved the Constitution "by an overall majority of three to one." *See* Cline, *supra*, at 52.

**5. We adopt a construction of Article XII, Section 3 that avoids free exercise concerns**

{43} Even though it appears that the people of New Mexico intended for Article XII, Section 3 to be a religiously neutral provision, the history of the federal Blaine amendment and the New Mexico Enabling Act lead us to conclude that anti-Catholic sentiment tainted its adoption. New Mexico was caught up in the nationwide movement to eliminate Catholic influence from the school system, and Congress forced New Mexico to eliminate public funding for sectarian schools as a condition of statehood. In *Moses II*, this Court looked to the history of the federal Blaine amendment and the Enabling Act to conclude that Article XII, Section 3 was intended to preclude any whisper of support for *private* schools. *Moses II*, 2015-NMSC-036, ¶¶ 19-24, 32. After *Trinity Lutheran* and the cases interpreting the Free Exercise

33

Clause that have followed, we must reconsider our conclusion through a different lens, one that focuses on discriminatory intent.

{44}     Prior to *Trinity Lutheran*, this Court's interpretation of Article XII, Section 3 in *Moses II* fell into the "play in the joints" between what the Establishment Clause permits and what the Free Exercise Clause requires. *See Locke*, 540 U.S. at 719 (noting that "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause"). In other words, in *Moses II* we concluded that New Mexico's interest in restricting public funding for *private* schools was a lawful basis for restricting funding for *religious* schools. Following *Moses II*, the Supreme Court emphasized that the Free Exercise Clause is implicated by a law that "single[s] out the religious for disfavored treatment." *Trinity Lutheran*, 137 S. Ct. at 2020. The Supreme Court has since underscored the state's constitutional duty to avert religious discrimination. *See Masterpiece Cakeshop*, 138 S. Ct. at 1731 ("The Constitution commits government itself to religious tolerance, and upon even *slight suspicion* that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures."). Thus, we conclude that this Court's previous interpretation of Article XII, Section 3 in *Moses II* raises concerns under the

34

Free Exercise Clause.

{45}   When interpreting the New Mexico Constitution, we avoid a construction that raises concerns under the federal constitution. *See State v. Radosevich*, 2018-NMSC-028, ¶ 8, 419 P.3d 176 (recognizing "the well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions" (internal quotation marks and citation omitted)); *State ex rel. State Highway Comm'n v. City of Aztec*, 1967-NMSC-046, ¶ 9, 77 N.M. 524, 424 P.2d 801 ("[P]rinciples governing the construction of statutes apply also to the interpretation of constitutions[.]"). When a state constitutional provision "is susceptible to two constructions, one supporting it and the other rendering it void," this Court "should adopt the construction which upholds its constitutionality." *See N.M. State Bd. of Educ. v. Bd. of Educ. of Alamogordo Pub. Sch. Dist. No. 1*, 1981-NMSC-031, ¶ 26, 95 N.M. 588, 624 P.2d 530.

{46}   To avoid constitutional concerns, we adopt a construction of Article XII, Section 3 that does not implicate the Free Exercise Clause under *Trinity Lutheran*. We have previously held that Article XII, Section 3 serves the dual purposes of ensuring that the state maintains control over the public education system and that the public schools do not become religious schools. *Prince v. Bd. of Educ. of Cent.*

35

*Consol. Indep. Sch. Dist. No. 22*, 1975-NMSC-068, ¶ 20, 88 N.M. 548, 543 P.2d 1176. The IML neither divests the state of control over the public schools nor affects the non-religious character of the public schools. Like the 1891 act establishing New Mexico's public school system, the IML grants students access to appropriate textbooks regardless of their parents' financial resources, which helps students fulfill their duty to attend school. *See* N.M. Const. art. XII, § 5 (making school attendance compulsory); NMSA 1978, § 22-12-2(A) (2015) (same). The textbook loan program furthers New Mexico's legitimate public interest in promoting education and eliminating illiteracy. *See* NMSA 1978, § 22-1-1.2(E) (2015) (setting forth the Legislature's finding that "improving children's reading and writing abilities and literacy throughout their years in school must remain a priority of the state"). We conclude that the IML provides a public benefit to students and a resulting benefit to the state. Any benefit to private schools is purely incidental and does not constitute "support" within the meaning of Article XII, Section 3. We hold that loaning secular textbooks to private school students under the IML does not violate Article XII, Section 3.

**C.     The IML Does Not Result in Any Appropriation to a Person or Entity Not Under the Absolute Control of the State as Prohibited by Article IV, Section 31**

{47} Petitioners argue that lending textbooks to private school students under the IML violates Article IV, Section 31, which provides in relevant part, "No appropriation shall be made for charitable, educational or other benevolent purposes to any person, corporation, association, institution or community, not under the absolute control of the state." The Department and Intervenors argue that the IML does not implicate Article IV, Section 31. We agree with the Department and Intervenors.

{48} Article IV, Section 31 imposes limits on the Legislature's authority to appropriate money. Under the IML, appropriations are made only to the Department. *See* § 22-15-5(A). The Department is an executive agency established by the New Mexico Constitution and is under the absolute control of the state. *See* N.M. Const. art. XII, § 6(A); *see also* NMSA 1978, § 22-2-1(B) (2004) (setting forth the general powers of the Department). The IML does not result in an appropriation to any person or entity not under the absolute control of the state. The fact that students derive a benefit from the IML does not implicate Article IV, Section 31. *Compare State ex rel. Interstate Stream Comm'n v. Reynolds*, 1963-NMSC-023, ¶¶ 16-17, 71 N.M. 389, 378 P.2d 622 (holding that although certain communities and nonprofit organizations would benefit from appropriations to the State Engineer, the appropriations did not

implicate Article IV, Section 31 because the State Engineer retained absolute control over their expenditure), *with Harrington v. Atteberry*, 1915-NMSC-058, ¶¶ 66-67, 21 N.M. 50, 153 P. 1041 (Hanna, J., concurring in result) (majority of three-justice panel concluding that appropriation of funds to the fair association violated Article IV, Section 31 because the funds did not remain under the control of the state). We hold that the IML does not result in any appropriation to a person or entity not under the absolute control of the state as prohibited by Article IV, Section 31.

**D.      Loaning Textbooks to Students Under the IML Does Not Constitute a Donation to Any Person or Entity as Prohibited by Article IX, Section 14**

{49}      Petitioners argue that lending textbooks to private school students under the IML violates the anti-donation clause of Article IX, Section 14, which provides, "Neither the state nor any county, school district or municipality, except as otherwise provided in this constitution, shall directly or indirectly lend or pledge its credit or make any donation to or in aid of any person, association or public or private corporation." Petitioners do not contend that the IML results in the lending or pledging of government credit. Thus, the IML implicates the anti-donation clause only if a textbook loan constitutes a "donation" within the meaning of Article IX, Section 14. The Department and Intervenors argue that the IML does not violate

38

Article IX, Section 14 because a textbook loan is not a donation. We agree with the Department and Intervenors.

{50}     This Court has defined donation, for purposes of Article IX, Section 14, as "a gift, an allocation or appropriation of something of value, without consideration." *Vill. of Deming v. Hosdreg Co.*, 1956-NMSC-111, ¶ 36, 62 N.M. 18, 303 P.2d 920 (per curiam) (internal quotation marks omitted). Article IX, Section 14 permits "incidental aid or resultant benefit to a private corporation or other named recipients" unless the aid or benefit "by reason of its nature and the circumstances surrounding it, take on character as a donation in substance and effect." *Vill. of Deming*, 1956-NMSC-111, ¶¶ 34, 37. This Court has found violations of the anti-donation clause in circumstances involving an outright gift of public money to a private individual or entity. *See, e.g.*, *Chronis v. State ex rel. Rodriguez*, 1983-NMSC-081, ¶¶ 24, 30, 100 N.M. 342, 670 P.2d 953 (holding that a law granting liquor licensees a credit against gross receipts taxes owed to state constituted an unconstitutional subsidy to the liquor industry); *State ex rel. Mechem v. Hannah*, 1957-NMSC-065, ¶¶ 18, 40, 63 N.M. 110, 314 P.2d 714 (holding unconstitutional a law granting "an outright gift" of public funds to ranchers and farmers to purchase livestock feed in times of drought); *Hutcheson v. Atherton*, 1940-NMSC-001, ¶¶ 24, 35, 44 N.M. 144, 99 P.2d 462

39

(holding unconstitutional the appropriation of bond money to finance auditoriums for use by private corporations because the aid was "direct and substantial").

{51}     In this case, the textbook loan program does not involve any donation or gift to students or private schools. The Department merely loans textbooks to students for use while attending school. *See* §§ 22-15-7, 22-15-10(B). The Department retains ownership and control over the textbooks and the fund used to purchase them. *See* §§ 22-15-4(B), 22-15-5(A), 22-15-10(E). We hold that loaning textbooks to students under the IML does not involve a donation to any person or entity as prohibited by Article IX, Section 14.

**E.     Equal Protection Clauses of the State and Federal Constitutions**

{52}     The Department and Intervenors argue that excluding private school students from participation in the textbook loan program violates the equal protection guarantees of the state and federal constitutions. *See* U.S. Const. amend. XIV, § 1; N.M. Const. art. II, § 18. We decline to address these arguments because we conclude that private school students may participate in the textbook loan program. *See Trinity Lutheran*, 137 S. Ct. at 2024 n.5 (deciding the case on free exercise grounds and declining to reach the equal protection claim raised by the church).

**III.     CONCLUSION**

40

{53} We hold that the textbook loan program established by the IML does not violate Article IV, Section 31; Article IX, Section 14; or Article XII, Section 3 of the New Mexico Constitution. We reinstate the provisions of the IML that allow private school students to participate in the textbook loan program.

{54} **IT IS SO ORDERED.**


_____
**BARBARA J. VIGIL, Justice**

**WE CONCUR:**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**CHARLES W. DANIELS, Justice**

**JUDITH K. NAKAMURA, Chief Justice, dissenting**

**GARY L. CLINGMAN, Justice, joining in dissent**

41

**NAKAMURA, Chief Justice (dissenting).**

{55}    *Moses II* correctly concluded that the provision of school books under the IML to students who attend *private schools*—whether secular or religious—violates the plain language of Article XII, Section 3.   *Moses II*, 2015-NMSC-036, ¶ 2. Understanding what *Trinity Lutheran* does and does not do makes clear that this Court should not abandon this conclusion.

{56}    *Trinity Lutheran* holds that, "[i]f a state awards grants, on religiously neutral criteria, to create safer playground surfaces, it cannot exclude an otherwise eligible playground simply because it is owned by a church.  Such discrimination against religion violates the Free Exercise Clause, and awarding the grant would not violate the Establishment Clause." Douglas Laycock, *Churches, Playgrounds, Government Dollars—and Schools?*, 131 Harv. L. Rev. 133, 133 (2017); *see Trinity Lutheran*, 137 S. Ct. at 2024.  At the heart of the *Trinity Lutheran* Court's holding is the following thought: "If the state neutrally supports playground surfaces for religious and secular daycares alike, and for religious daycares of different faiths, it is supporting daycares, or just playgrounds, but not religion.  Equal funding gives the religious daycares no advantage; funding only secular daycares would put religious daycares at a disadvantage." Laycock, *supra,* at 147.  This thought is not a departure from settled

First Amendment principles.

{57}     The conclusion in *Trinity Lutheran* that Missouri cannot disqualify an applicant for a public benefit "solely because of its religious character," 137 S. Ct. at 2024, advances the "core principles of the Religion Clauses: that government should not penalize any person because of his religion, and that government should be neutral with respect to the people's religious choices and commitments."  Laycock, *supra*, at 148. *But see Trinity Lutheran*, 137 S. Ct. at 2027 (Sotomayor, J., dissenting) ("The Court today profoundly changes th[e] relationship [between church and state] by holding, for the first time, that the Constitution requires the government to provide public funds directly to a church.  Its decision slights both our precedents and our history, and its reasoning weakens this country's longstanding commitment to a separation of church and state beneficial to both.").  This is an adequate summary of what *Trinity Lutheran* does.  We need to understand with equal certainty what *Trinity Lutheran* does not do.

{58}     Footnote three of Chief Justice Robert's opinion for the Court[2] points out that *Trinity Lutheran* "involves *express discrimination* based on religious identity" and

---

[2]Footnote three was joined by four justices (including the Chief Justice), but has unquestionable significance for future cases (like this one) given how the other Justices proposed to resolve *Trinity Lutheran*.  Laycock, *supra*, at 135-36.

43

clarifies that *Trinity Lutheran* does not "address religious uses of funding or *other forms of discrimination*." 137 S. Ct. at 2024 n.3 (emphasis added). In other words, "[f]ootnote three carefully limits the reach of the opinion" and "reserve[s]" the very issue before this Court on remand: whether a very different form of alleged discrimination than that considered in *Trinity Lutheran* is also an unconstitutional abridgment of religious liberty. Laycock, *supra*, at 134-35.

{59} The "discrimination" we are faced with here, on remand, is "public-private, not religious-secular." *Id.* at 167. This difference is critical. Because of this difference, "motive" becomes essential. *Id.* at 167-68. The question remand to this Court prompts is this: was Article XII, Section 3 "adopted because of a desire to prohibit funding for Catholic education?" Laycock, *supra*, at 167. "If [Article XII, Section 3] was motivated by anti-Catholicism, it should be unconstitutional." Laycock, *supra*, at 168. This is because, "[w]here sufficient evidence of motive is available, *Trinity Lutheran* should extend to cases of antireligious discrimination shrouded in facially neutral provisions." Laycock, *supra*, at 169. Careful attention must be paid to the instances of the word "should" in the two preceding sentences.

{60} *Trinity Lutheran* does not resolve the question presented on remand. Laycock, *supra*, at 134. We can only make educated guesses about how the United States

Supreme Court will resolve the issues reserved, and we will only know whether those guesses are correct when the Supreme Court takes up the "next round of cases." *Id.* at 169. While we eagerly await future guidance, we must nevertheless answer the question before us: whether there is sufficient evidence that the motivations for the enactment of Article XII, Section 3 were discriminatory. I cannot conclude sufficient evidence exists.

{61} "In determining if the object of a law is a neutral one under the Free Exercise Clause, we can . . . find guidance in . . . equal protection cases." *Lukumi*, 508 U.S. at 540. In the equal protection context, a litigant claiming that a facially neutral provision is unconstitutional because it emanates from discriminatory motives is required to establish that the provision did in fact arise from discriminatory motives. *See Hunter*, 471 U.S. at 227-28; *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State."). Only after making such a showing must the proponent of the provision's constitutionality attempt to rebut the claim. *Hunter*, 471 U.S. at 227-28.

{62} "Proving the motivation behind official action is often a problematic undertaking." *Id.* at 228. This is particularly true when the official action under

45

review is the drafting of a constitutional provision that occurred a century ago. *See id.* The problem is only further compounded when the provision under scrutiny is neutral and constitutional on its face. *Id.*

{63}     The history the majority recounts suggests that a straight line of anti-Catholic bigotry runs from the motivations underlying the Blaine Amendment to Article XII, Section 3. *Maj. Op.* ¶¶ 12-17, 43. This history, first explicated in *Moses II*, purports to establish that anti-Catholic animus prompted the Blaine Amendment, which was in turn incorporated into the Enabling Act (most directly) at Section 8, which was in turn the basis for Article XII, Section 3. *Maj. Op.* ¶¶ 12-17, 43. *Moses II* was too quick to conclude that the root of this series of events was, in fact, anti-Catholic bigotry.

{64}     "Those who characterize the Blaine Amendment as a singular exercise in Catholic bigotry . . . give short shrift to the historical record and the dynamics of the times." Steven K. Green, *The Insignificance of the Blaine Amendment*, 2008 B.Y.U. L. Rev. 295, 296 (2008).

> The Blaine Amendment had as much to do with the partisan climate of the post-Reconstruction era and related concerns about federal power over education as it did with Catholic animus. Included in the mix was a sincere effort to make public education available for children of all faiths and races, while respecting Jeffersonian notions of church-state

46

separation.

*Id.* (internal quotation marks and citation omitted). Any attempt at a summary of the many social forces at play in the lead-up to the creation of the Blaine Amendment is beyond the scope of this dissent. *See generally id.* It suffices to state that there is reason to doubt the first link in the chain of inferences that must be accepted to conclude that Article XII, Section 3 was motivated by anti-Catholic animus (i.e., that anti-Catholic animus was the sole force behind the Blaine Amendment). The next link—that between the Blaine Amendment and the Enabling Act—is equally susceptible to attack.

{65} The suggestion that the motives underlying the Blaine Amendment (whatever they were) were shared by the drafters of the Enabling Act is problematic. The enabling act

> which authorized the statehood of Arizona and New Mexico contained the proviso that both nascent states must have constitutional language forbidding public funding to sectarian schools. Opponents of the Blaine Amendment claim that the same anti-Catholic animus behind the federal Blaine Amendment motivated this mandate to new states in the enabling acts. However, a recent study by historians prepared in an amicus brief to *Locke v. Davey* found that no evidence of anti-Catholic bigotry lay behind a similar enabling act for Washington State that same year, and the Supreme Court noted in a footnote that the history of the federal Blaine Amendment was not relevant to consideration of Washington's similar provision.

Jill Goldenziel, *Blaine's Name in Vain?: State Constitutions, School Choice, and Charitable Choice*, 83 Denv. U. L. Rev. 57, 79-80 (2005) (footnotes omitted). The "legal and religious historians and law scholars who" authored the amicus brief in *Locke* point out that "[m]any state constitutions . . . contain no-funding provisions [like Article XII, Section 3] that have nothing to do with anti-Catholicism or nativist sentiment." Brief Amicus Curiae of Historians and Law Scholars on Behalf of Petitioners Gary Locke, et al., *Locke v. Davey*, 540 U.S. 712 (2004) (No. 02-1315), 2003 WL 21697729 at 1, 4. They further note that "[t]he no-funding principle, as applied to educational matters, arose independently of and prior to the rise of Catholic parochial schooling and the organized nativist movement of the mid-nineteenth century." *Id.* at 2.

{66} These authorities are offered not as indisputably correct and definitive; rather, they merely illuminate the complexity of the historical questions before us: What, precisely, were the motives behind the Blaine Amendment? How, exactly, did those motives influence the drafters of the Enabling Act? And how, specifically, did these events influence the drafters of Article XII, Section 3? It is because the answers to these difficult questions are uncertain at best and because we must "eschew guesswork" that other interpretive tools must be prioritized. *Hunter*, 471 U.S. at 228,

48

(internal quotation marks and citation omitted).

{67} As *Moses II* observes, the drafters of our state constitution made a significant drafting decision when writing Article XII, Section 3. *Moses II*, 2015-NMSC-036, ¶ 27. Unlike Section 8 of the Enabling Act which "precludes the use of public funds for the support of sectarian or denominational schools[,]" Article XII, Section 3 restricts the use of public funds for "the much broader category of *private schools*." *Moses II*, 2015-NMSC-036, ¶ 27 (emphasis added). *Moses II* correctly notes that this drafting choice is self-evidently significant: "The members of the Constitutional Convention chose to play it safe—by broadening [Article XII, Section 3] to reach all private schools, they avoided drawing a line between secular and sectarian education." *Id.* ¶ 27. In other words, the drafters of Article XII, Section 3 took affirmative measures to decouple the provision from the problematic language in the Enabling Act. Our understanding of the drafter's motives must incorporate these measures, which strongly suggest that their motives were not discriminatory but the opposite. The majority seems in agreement with this point.

{68} The majority ultimately concludes that they cannot "impute an impermissible motive to the constitutional delegation[,]" *Maj. Op.* ¶ 42, and doubt that it is possible to "ascertain what motivated the delegates to draft Article XII, Section 3." *Maj. Op.*

49

¶ 42. They do accept, however, that "the constitutional delegates agreed it was essential to guarantee the civil, religious, and political rights of the native New Mexicans[,]" who were largely Catholic. *See Maj. Op.* ¶¶ 37, 42. It is difficult to see how the majority's conclusions and concessions do not end the inquiry in this case and dictate the outcome.

{69} "Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 277 (1979). It "implies more than intent as volition or intent as awareness of consequences." *Id.* "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* (internal quotation marks omitted).

{70} Respondents have not established that Article XII, Section 3 was the product of impermissible, discriminatory motives, and the majority appears to recognize this. All that has been established is that Article XII, Section 3 is guilty by association. *See Maj. Op.* ¶ 43 ("Even though it appears that the people of New Mexico intended for Article XII, Section 3 to be a religiously neutral provision, the history of the federal Blaine amendment and the New Mexico Enabling Act lead us to conclude that

50

anti-Catholic sentiment *tainted its adoption*." (emphasis added)). But this is insufficient and does not amount to discriminatory intent or purpose as the United States Supreme Court has defined this concept.

{71} Moreover, the claim of guilt by association here is doubtful as the history associated with the Blaine Amendment and Enabling Act are unclear at best. We are left wondering: With what, exactly, is Article XII, Section 3 guilty of associating? More critically, "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (internal quotation marks and citation omitted). The drafters of our constitution took affirmative measures to avoid becoming ensnared by the nativist discrimination—to whatever extent it existed—in the Blaine Amendment and Enabling Act. We should not ignore these efforts and condemn the drafters to be forever and inescapably associated with a viewpoint the majority acknowledges the drafters of Article XII, Section 3 did not embrace.

{72} *Moses II*'s conclusion that the plain language of Article XII, Section 3 prohibits the state from loaning textbooks to children enrolled in private schools does not run afoul of the principles articulated in *Trinity Lutheran*. There is insufficient evidence Article XII, Section 3 stems from discriminatory motives. Respondent and

51

Intervenor's renewed free-exercise claims fail. The majority disagrees and embraces a construction of Article XII, Section 3 that is inconsistent with the provision's plain language and permits the state to loan secular textbooks to private school students, including religious students. *See Maj. Op.* ¶ 46. They do so to "avoid constitutional concerns," but these are concerns that do not exist. *Id.*

{73} Because the conclusions in *Moses II* survive *Trinity Lutheran* and because the IML violates Article XII, Section 3, there is no need to address whether the IML also violates Article IV, Section 31 or Article IX, Section 14 of our state constitution. *See Baca v. N.M. Dep't of Pub. Safety*, 2002-NMSC-017, ¶ 12, 132 N.M. 282, 47 P.3d 441 (noting that courts exercise judicial restraint by deciding cases on the narrowest possible grounds and avoid reaching unnecessary constitutional issues).

{74} The majority does not address Respondent and Intervenor's arguments that interpreting Article XII, Section 3 to preclude the provision of books to private schools gives rise to a violation of our state constitution's equal protection clause. The majority need not do so given their resolution of this matter. *See Maj. Op.* ¶ 52. Because I resolve this case differently, I address these claims.

{75} The argument presented is that providing books to public school students but not to private school students treats two classes of similarly-situated students

52

differently. Public school students will receive books, private school students will not. This disparate treatment is a violation of equal protection, or so it is argued.

{76} "The New Mexico Constitution provides that no person shall be denied equal protection of the laws." *Wagner v. AGW Consultants*, 2005-NMSC-016, ¶ 21, 137 N.M. 734, 114 P.3d 1050 (citing N.M. Const. art. II, § 18). "Like its federal equivalent, this is essentially a mandate that similarly situated individuals be treated alike, absent a sufficient reason to justify the disparate treatment." *Id.* "What level of scrutiny we use depends on the nature and importance of the individual interests asserted and the classifications created by the statute." *Id.* ¶ 12. "Rational basis review applies to general social and economic legislation that does not affect a fundamental or important constitutional right or a suspect or sensitive class." *Breen v. Carlsbad Mun. Sch.*, 2005-NMSC-028, ¶ 11, 138 N.M. 331, 120 P.3d 413. "Under rational basis review, the challenger must demonstrate that the legislation is not rationally related to a legitimate government purpose." *Rodriguez v. Brand W. Dairy*, 2016-NMSC-029, ¶ 23, 378 P.3d 13. It is conceded that rational basis review applies to the equal-protection argument presented.

{77} The decision by the drafters of our state constitution that state largesse be directed to the public schools alone, and not to private schools, is rationally supported

53

by the legitimate principle that doing so ensures that the public schools of our state are maximally financed, a circumstance necessary to ensure that "[a] uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state shall be established and maintained." N.M. Const. art. XII, § 1. "It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause." *Norwood v. Harrison*, 413 U.S. 455, 462 (1973).

{78}     *Trinity Lutheran* does not require us to abandon the conclusion reached in *Moses II* that Article XII, Section 3 precludes the provision of school books to private schools under the IML. The state-constitution, equal-protection claims advanced by Respondent fails.

{79}     Accordingly, I respectfully dissent.

_____

**JUDITH K. NAKAMURA, Chief Justice**

**I CONCUR:**

_____

**GARY L. CLINGMAN, Justice**